CINDY MILLER, Plaintiff-Appellant, v. DANVILLE ELKS LODGE 332, B.P.O.E., *et al.*, Defendants-Appellees (Cathy Jacobs, Defendant).

Fourth District   No. 4—90—0525

Opinion filed March 28, 1991.

Michael R. Cornyn, of Thomas, Mamer & Haughey, of Champaign, for appellant.

Sebat, Swanson, Banks, Garman & Townsley, of Danville (Robert J. Banks, Jr., of counsel), for appellees Danville Elks Lodge 332 and Hal Hedges.

Steven M. Helm, of Dukes, Martin, Helm & Ryan, Ltd., of Danville, for appellee Carol Shaw.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff, Cindy Miller, brought a defamation action against three co-workers and her employer, Danville Elks Lodge 332 (Elks). She appeals from an order of summary judgment in favor of defendants Elks, Hal Hedges, and Carol Shaw. Defendant Cathy Jacobs is not a party to this appeal.

Plaintiff was employed by the Elks from January 1982 to March 17, 1986. At the time the alleged defamation occurred, plaintiff acted as comptroller for the Elks and was paid $18,000 per year. Defendants Cathy Jacobs and Carol Shaw worked under plaintiff in the accounting department; Carol Shaw was responsible for accounts payable, and Cathy Jacobs was responsible for, among other things, the petty cash fund. This fund, containing between $1,500 and $2,000, insured there was adequate cash for the Elks' clubhouse, bar, and pool facilities.

This case began as defendant Cathy Jacobs approached Ron Cole, an officer of the Elks, telling him of allegedly improper practices in the accounting department. An informal meeting was then held at Cole's house, attended by Cathy Jacobs and Carol Shaw, and officers Monte Goodwin, Sam Shank, Ron Cole, Frank Young, Murray Jordan, and Bob Hoskinson. Shaw had been laid off one week prior to the meeting, apparently for financial reasons.

At this meeting, Jacobs and Shaw alleged plaintiff (1) borrowed money from the petty cash fund, (2) made long-distance personal phone calls without reimbursing the Elks for all the calls, and (3) paid herself an extra paycheck. Plaintiff extensively discusses the allegations concerning the personal long-distance calls and the extra paycheck. However, these allegations are not complained of in plaintiff's cause of action and are irrelevant to the issues in this appeal.

Jacobs brought three IOU slips to the meeting, all signed "Cindy," for $10, $15, and $265. A photocopy of these slips was

shown to plaintiff, Ron Cole, Carol Shaw, and Cathy Jacobs at their depositions. Plaintiff first denied she signed any of the slips, then upon reviewing her deposition testimony, changed her answer to "yes." Plaintiff explained she amended her answer because she "may have signed it for purchases of store goods, or something of that nature." She denied ever borrowing funds from petty cash for personal purposes.

At her deposition, Shaw identified three slips as those Jacobs brought to the meeting, but could only identify one of the slips, for $15, as being in plaintiff's handwriting. Shaw testified she had seen other slips signed "Cindy," in addition to those three. Jacobs also identified the three slips, and denied she signed them "Cindy." She testified sometimes she signed "Cindy" on IOU slips at plaintiff's request. Jacobs testified plaintiff borrowed money from the petty cash fund, and her highest balance owed the fund was over $1,000. Jacobs knew this because she had to figure in the IOU slips to make the petty cash fund balance. When Jacobs left the Elks, a few days after plaintiff left, she believed plaintiff owed no money to the petty cash fund.

After the meeting at Ron Cole's house, Frank Young and Bob Hoskinson investigated the allegations. In the search for records of the petty cash fund, they found voucher slips signed "Cindy." Frank Young testified he could not remember whether they found the slips at the Elks, or if they were given to him at the meeting.

A second meeting was scheduled to report the findings of this investigation. Before this meeting, plaintiff told Shank that Jacobs was borrowing the money from petty cash, and that plaintiff would pay for the phone calls. Shank testified that when he told her of the second meeting, plaintiff offered to attend if he wanted her to. Plaintiff testified she asked to attend the meeting to rebut the allegations, and Shank said he would call her about the meeting, which he never did.

After the second meeting, Sam Shank, Frank Young, and Bob Hoskinson were delegated to speak to plaintiff the next day, Monday, March 17. Shank testified the group was to ask for plaintiff's resignation or fire her. A few hours before they were to speak with plaintiff on Monday, Jim Benford, secretary of the Elks and secretary of the management committee, asked Hal Hedges, "Well what the hell is going on around here?" Hal Hedges replied, "Cindy has been taking money from petty cash." Cindy then denied this, and Hedges said, "I didn't mean it that way." Hedges explained, "That's what I heard."

When the three met with plaintiff on Monday, she denied borrowing from petty cash, and again alleged it was not her but Jacobs. There is some dispute whether plaintiff was fired or resigned that Monday afternoon. Sam Shank told plaintiff because she allowed the borrowing from the petty cash fund to occur, allowed the unauthorized use of the phone, and wrote herself the extra check, they would accept the offer of resignation she had made the previous Friday. When she asked Shank if he was asking for her keys, he replied, "Yes." She handed him her keys and believed she had been terminated. In her deposition testimony, plaintiff denied ever offering to resign.

Plaintiff later applied for unemployment benefits, which the Elks contested on the basis that she had resigned. Carolyn Hamilton, an Illinois Department of Employment Security (Department) adjudicator, spoke by telephone with Bill Young, the immediate past chairman of the board of trustees of the Elks. Hamilton's handwritten notes of the conversation, although not a verbatim transcript, reported Bill Young as stating, "Cindy misused funds from the club. We feel she took the funds, not the [other] person. *** We haven't pressed any charges." Bill Young said plaintiff resigned. From her investigation, Hamilton determined the Elks discharged plaintiff because they believed she was responsible for accounting discrepancies. While Hamilton found plaintiff's actions were "ill-thought," no misconduct or wilful disregard of the employer's interests was shown.

Plaintiff filed a four-count complaint alleging defendants Elks, Hedges, Shaw, and Jacobs made the following defamatory statements:

Count I alleged the Elks, through agent Bill Young, told Carolyn Hamilton, "Cindy misused funds from the club." And, "We feel she took the funds, not the [other] person."

Count II alleged Hal Hedges said " 'Cindy has been taking money from petty cash,' " to Jim Benford, meaning that "Plaintiff was stealing money from" the Elks.

Count III alleged Carol Shaw told the Elks' board or officers plaintiff was taking sums of money from petty cash without authority.

Count IV alleged Cathy Jacobs told the Elks' board or officers plaintiff was taking sums of money from the petty cash fund without authority.

Defendants Carol Shaw, the Elks, and Hal Hedges moved for summary judgment. The court granted summary judgment for these defendants, and made a Rule 304(a) finding (107 Ill. 2d R. 304(a));

count IV against Cathy Jacobs remained pending before the trial court.

■ A court appropriately grants summary judgment only when the pleadings, depositions, admissions on file, and affidavits present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. The court should interpret this material in the record in favor of the party opposing summary judgment. (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398, 415 N.E.2d 397, 402; *Harrison v. Sears, Roebuck & Co.* (1989), 189 Ill. App. 3d 980, 986-87, 546 N.E.2d 248, 252.) A motion for summary judgment does not require the party opposing it to prove his or her case, but that party must present some factual basis arguably entitling him or her to judgment. *Harrison*, 189 Ill. App. 3d at 987, 546 N.E.2d at 252.

■ The trial court found the remarks made by all defendants defamatory *per se*. The court further found the statements incapable of an innocent construction which would render them nonactionable as a matter of law. Statements are defamatory *per se* when, by their nature, they so obviously and naturally harm plaintiff that damages are presumed. (*Owen v. Carr* (1986), 113 Ill. 2d 273, 277, 497 N.E.2d 1145, 1147.) False statements which (1) impute a lack of integrity in discharging the duties of an office or employment, (2) prejudice a party in his or her profession, or (3) impute plaintiff committed a criminal offense are all defamatory *per se*. (*Owen*, 113 Ill. 2d at 277, 497 N.E.2d at 1147.) Whether a statement constitutes defamation *per se* is a question of law. *Suhadolnik v. City of Springfield* (1989), 184 Ill. App. 3d 155, 186, 540 N.E.2d 895, 913.

■ When analyzing whether the statements at issue constitute defamation *per se*, we must consider them in light of the innocent construction rule. (*Owen*, 113 Ill. 2d at 278, 497 N.E.2d at 1147.) This rule holds if a statement may reasonably be given an innocent interpretation, then it cannot be actionable *per se*. Remarks must be examined in context, and we must give the words and implications their natural and obvious meanings. *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199.

Our supreme court recently discussed the innocent construction rule at length in *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 552 N.E.2d 973. There, an attorney spent three years pursuing a case that was eventually dismissed when the opposing party successfully raised the statute of limitations. His supervising attorney, under fire from the law firm's board of directors, responded the loss was not his fault, but that of plaintiff, who "sat on the statute of limitations defense" with knowledge of dispositive adverse authority for three

years. (*Mittelman,* 135 Ill. 2d at 229, 552 N.E.2d at 977.) This allegation constituted defamation *per se* because it charged legal malpractice and would prejudice an attorney in his profession, so much so that damages were presumed. The court held there was no possible innocent construction of the statement because it could not be interpreted as anything but a charge of professional negligence. *Mittelman,* 135 Ill. 2d at 245-48, 552 N.E.2d at 985-86.

The importance of examining allegedly defamatory remarks in context was illustrated by *Owen.* In that case, plaintiff, an attorney, filed a complaint with the Illinois Judicial Inquiry Board against a circuit judge. The judge then sued the attorney, alleging the complaint contained defamatory statements. The judge's attorney stated in a newspaper article that Owen had not filed the complaint against the judge in the interest of justice, but was trying to " 'deliberately *** intimidate Judge Starnes and other judges in future cases involving [Owen's client].' " (*Owen,* 113 Ill. 2d at 276, 497 N.E.2d at 1146.) The court rejected plaintiff's argument that the claim he attempted to "intimidate" the judge constituted defamation *per se, i.e.,* harmed his professional reputation. Examining the statements in context, as required by the innocent construction rule, revealed them to be " 'an attorney's biased presentation of his client's view.' " (*Owen,* 113 Ill. 2d at 280, 497 N.E.2d at 1148.) As such, they were not actionable *per se.*

In the instant case, the trial court held the statements by defendants Elks, Hedges, and Shaw constituted defamation *per se* because they "allege improprieties in Plaintiff's conduct in her position of comptroller," and were incapable of an innocent construction. Plaintiff claims the statements alleged either the commission of a crime or they impugned her integrity or ability in her job as comptroller. Defendants Elks and Hedges press for an innocent construction that the statements meant she was improperly borrowing money from the petty cash fund or improperly supervising its use. Shaw argues her statement was subject to the innocent construction that borrowing from petty cash could be interpreted as proper because it was done with the intention to repay the amount borrowed.

■ We conclude the trial court correctly held the remarks by the Elks and Hedges constituted defamation *per se.* Bill Young's statement that the Elks believed Cindy took and misused club funds was immediately followed with the statement, "We haven't pressed any charges." This implies plaintiff stole money from the Elks. If it merely referred to plaintiff's borrowing from petty cash, the qualifier about pressing charges would not have been added, since the Elks

could not have pressed charges for the offense of "borrowing." The count against Hal Hedges likewise constitutes defamation *per se* because it alleges the commission of a crime. The complaint alleges Hedges said " 'Cindy has been taking money from petty cash' *** meaning that plaintiff was stealing money from the Elks."

■ However, the count against Carol Shaw does not state a cause of action because it appears from the record Shaw only reported that plaintiff was borrowing funds from petty cash. Nowhere in the complaint does plaintiff claim this statement was an allegation of theft. Additionally, the count alleges Shaw said plaintiff was taking "money from petty cash *without* authority." (Emphasis added.) Applying the innocent construction rule to Shaw's statements, we find they can be interpreted as allegations that plaintiff merely borrowed money from petty cash, and are thus not defamatory *per se.* As such, it does not impute plaintiff committed a crime, or even that she lacks integrity in discharging the duties of comptroller. Borrowing from petty cash without authority may not be a standard accounting practice, but it implies a lack of rigor in following proper procedures, rather than a lack of integrity in carrying out the duties of comptroller. We thus hold Carol Shaw's statement does not constitute defamation *per se.*

■ We now turn to the question of whether defendants were protected by a qualified privilege in making their statements. A statement is privileged when made by a defendant (1) in good faith; (2) with an interest or duty to uphold; (3) limited in scope to that purpose; (4) on a proper occasion; and (5) published only to a proper party. (*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 243 N.E.2d 217.) The privilege exists if these conditions are met, even if the statement is false and alleges a crime. Whether the privilege exists is a question of law. (*Ashe v. Hatfield* (1973), 13 Ill. App. 3d 214, 218, 300 N.E.2d 545, 548.) The trial court held all of defendants' alleged defamatory statements were entitled to a qualified privilege.

Statements motivated by a legitimate business or employment interest may be protected by a qualified privilege. (*Edwards v. University of Chicago Hospitals & Clinics* (1985), 137 Ill. App. 3d 485, 489-90, 484 N.E.2d 1100, 1104 (qualified privilege exists for alleged defamatory diagnosis published in standard insurance form, prepared in the normal course of business); *Zeinfeld,* 41 Ill. 2d at 348-49, 243 N.E.2d 220-21 (qualified privilege exists for defamatory response in a mortgagor's questionnaire completed by plaintiff's former employer).) The interest to be upheld must not necessarily be a legal one, as it

may be sufficient if the speaker has a good-faith belief he or she has a moral or social duty to uphold. *Judge v. Rockford Memorial Hospital* (1958), 17 Ill. App. 2d 365, 376-77, 150 N.E.2d 202, 207.

In the instant case, plaintiff concedes defendants Elks' and Shaw's statements are protected by a qualified privilege, because they were motivated by a legitimate business interest. Plaintiff challenges, however, the trial court's ruling that a qualified privilege exists for defendant Hal Hedges as a matter of law. Plaintiff argues Hedges failed to show three elements of the privilege: (1) Hedges had an interest or duty to uphold; (2) the statement was made to a proper person; and (3) the statement was made at the proper time.

Plaintiff's contentions are without merit, and it is clear Hedges was entitled to a qualified privilege as he properly established all its elements. First, under *Rockford Memorial Hospital,* Hedges had an interest to uphold as club manager. Responsible for insuring the club operated properly, Hedges was certainly entitled to respond to a question from the secretary of the Elks and of the management committee about "what *** [was] going on" at the Elks. An employee's use of the petty cash fund is within the range of interests the club manager is privileged to speak freely on and, indeed, may be expected to discuss. Plaintiff makes much of the fact that Hedges apparently was her equal in terms of management level at the Elks and, having no supervisory authority over her, was not privileged in his statement. We find no authority and no sound reason for this proposition.

Second, we reject plaintiff's argument that Jim Benford was an improper party to speak to. As noted above, Benford was the secretary of the Elks, an officer's position, and also secretary to the management committee. As such, Benford clearly had similar interest in ensuring the club and its employees, including plaintiff, operated properly. Finally, Hedges' statement was made during business hours, at the Elks' place of business, apparently with plaintiff being the only other person in earshot. We find absolutely no reason why such a statement could be held to have been made at an improper time. The facts supporting a qualified privilege for Hedges' statement are undisputed and sufficiently establish Hedges was entitled to a qualified privilege as a matter of law.

A defendant who has established a qualified privilege will lose the protection of that privilege only if he or she spoke with actual malice, *i.e.,* (1) defendant knew the statement was false; or (2) the statement was made with reckless disregard as to its truth. (*Ashe,* 13 Ill. App. 3d at 218, 300 N.E.2d at 548; *Mittelman,* 135 Ill.

2d at 237, 552 N.E.2d at 981.) Reckless disregard occurs when defendant publishes a statement with a "high degree of awareness of [its] probable falsity or entertain[s] serious doubts as to its truth." (*Mittelman*, 135 Ill. 2d at 238, 552 N.E.2d at 981, citing *Harte-Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, 667, 105 L. Ed. 2d 562, 576, 109 S. Ct. 2678, 2685.) The burden is on plaintiff to show defendants spoke with actual malice. *Ashe*, 13 Ill. App. 3d at 218, 300 N.E.2d at 548.

■ Defendants cannot defeat allegations of malice simply by testifying they believed their statements true—the fact finder must independently determine whether they made them in good faith. (*Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 420-21, 532 N.E.2d 790, 798.) However, when there is no evidence supporting a finding of actual malice, the "mere hope" of attacking defendant's credibility is insufficient to oppose summary judgment. *Weber v. Woods* (1975), 31 Ill. App. 3d 122, 131, 334 N.E.2d 857, 863.

The trial court held Hedges did not speak with malice when he told Jim Benford "Cindy has been taking money from petty cash." Plaintiff argues malice exists because there is no evidence in the record showing Hedges had a "reasonable belief in the truth of a statement." She misstates the law this court should apply, urging it to apply a negligence standard and find malice if Hedges cannot show he had a reasonable basis for believing the truth of his statement. However, the supreme court expressly overruled this negligence standard in the case plaintiff cites, *Mittelman*. Instead, malice will be found only if Hedges spoke knowing his statement was false, or with reckless disregard as to its truth. *Mittelman*, 135 Ill. 2d at 237, 552 N.E.2d at 981.

■ Plaintiff stresses Hedges was not part of the investigatory process, and no evidence explained how he learned of the allegations against plaintiff. However, how Hedges learned of the allegations is irrelevant to the court's determination. It does not necessarily matter how he came upon the information, as long as when he made the statement he did not in good faith know it was false, have a high degree of awareness of its probable falsity, or otherwise entertain serious doubts as to its truth. The court should focus on defendant's subjective state of mind, not the background investigation, if any, he conducted. As the supreme court stated in *Costello*, "[a]ctual malice is not measured by what a reasonably prudent person would have published or should have investigated before publishing. [Citation.] Failure to investigate does not itself establish actual malice if the

defendants did not seriously doubt the truth of their assertions." (*Costello*, 125 Ill. 2d at 421, 532 N.E.2d at 798.) The supreme court concluded, "actual malice may not be found if the defendants subjectively believed that their accusations were true." (*Costello*, 125 Ill. 2d at 426, 532 N.E.2d at 800.) Since no evidence indicates Hedges believed his statement was false, or made it with a reckless disregard as to its truth, plaintiff has raised no genuine issue of material fact over whether Hedges spoke with malice.

As to Shaw, in light of our finding that her statements did not constitute defamation *per se*, we need not discuss whether she spoke with malice. However, we note the trial court correctly found no evidence of malice when she told the Elks' officers plaintiff borrowed money from petty cash. Shaw testified she believed it was plaintiff, and not Cathy Jacobs, who borrowed money from petty cash because Shaw saw the IOUs in the petty cash box signed "Cindy." Plaintiff incorrectly argues Shaw had "no reasonable basis for her belief that Cindy misused funds from petty cash," since Shaw was unable to positively identify all three IOU slips at her deposition, and that this constitutes evidence of malice. However, Shaw had seen other petty cash slips with plaintiff's name on them, in addition to the three which were exhibits at the deposition. More importantly, plaintiff continues to urge this court to erroneously apply a negligence standard in determining whether malice existed, when she must instead show defendant knew the statement was false, or spoke it with reckless disregard as to its truth. Defendant does not meet this burden as she points to no evidence in the record Shaw believed her statement false, or had any doubts as to its truth.

Plaintiff also argues Shaw's statement at the officers' meeting that plaintiff "overpaid" herself by writing an extra check constitutes evidence of malice in her statement about the petty cash. This statement is irrelevant because, when determining whether malice exists, the court should examine the defamatory statement made, and not rely on other unrelated statements made by the defendant. *Powers v. Delnor Hospital* (1986), 148 Ill. App. 3d 844, 848, 499 N.E.2d 666, 669.

As to the Elks, plaintiff argues they had a financial reason for accusing her of theft (they were able to hire her replacement for $6,000 per year less, and theft by an employee provided a defense to her unemployment claim), and this motive constitutes evidence of malice. However, motive does not constitute malice. Furthermore, the Elks did not need to slander plaintiff in order to fire her since she was an at-will employee, and could be fired for any reason or no

reason; nor did they need to slander her as a defense to her unemployment claim (*i.e.*, misconduct (Ill. Rev. Stat. 1989, ch. 48, par. 432)) since their position that she resigned amounted to a defense (Ill. Rev. Stat. 1989, ch. 48, par. 431).

■■ Instead, the proper focus is on Bill Young's subjective state of mind when determining whether he spoke with malice. (*Costello*, 125 Ill. 2d at 419, 532 N.E.2d at 797.) While Bill Young testified he believed the truth of his allegation, he cannot insure malice will not be found merely by so testifying. We must independently review the record for any evidence supporting plaintiff's allegation of malice. We find there is some evidence in the record from which a trier of fact could infer that Bill Young spoke with malice. Plaintiff testified in her deposition that she confronted Bill Young over the allegations of her borrowing money from petty cash and denied them. Plaintiff testified Bill Young responded, "*Well I don't believe it* anyway since I know your family, and this is your livelihood we're talking about." (Emphasis added.) There is hardly any clearer evidence of malice than Bill Young stating he does not believe the truth of the allegations against plaintiff. At this stage of the proceedings, it is not necessary that plaintiff prove she would prevail at trial on this count. This alleged statement by Bill Young, interpreted in favor of plaintiff, does present a genuine issue of material fact properly resolved by the trier of fact. This evidence presents a factual basis arguably entitling plaintiff to judgment, and thus makes summary judgment on this count inappropriate. *Harrison*, 189 Ill. App. 3d at 986-87, 546 N.E.2d at 252.

For the above reasons, we affirm the summary judgment granted to defendants Hedges and Shaw. We reverse and remand the count against the Elks on the basis there is some evidence indicating Bill Young spoke with malice.

Affirmed in part; reversed in part and remanded.

SPITZ and KNECHT, JJ., concur.