MICHAEL E. MARTIN, Plaintiff-Appellant, v. STATE JOURNAL-REGISTER, a Division of the Copley Press, Inc., Defendants-Appellees.

Fourth District   No. 4—92—0915

Opinion filed April 29, 1993.

Frank B. Schweitzer (argued), of Taylorville, for appellant.

Barry O. Hines (argued) and R. Kurt Wilke, both of Barber, Segatto, Hoffee & Hines, of Springfield, for appellees.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In July 1986, plaintiff, Michael E. Martin (an officer with the Illinois Department of Conservation (DOC)), sued defendants, the State Journal-Register (a Springfield newspaper) and Pam Fortado Gibson (a free-lance writer for the State Journal-Register), for libel. Plaintiff's suit arose out of an article Gibson wrote that accused Martin of abusing his position as a conservation officer. In June 1992, defendants moved for summary judgment under section 2—1005 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005), claiming in essence that no genuine issue of material fact existed regarding whether Gibson wrote the article with actual malice as required by *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710. In August 1992, the trial court conducted a hearing on this motion and granted it. Plaintiff appeals from the order granting summary judgment for defendants.

We affirm.

I. BACKGROUND

During 1986, Gibson wrote a weekly free-lance column on environmental issues for the State Journal-Register, entitled "Wildlife window." During this time, plaintiff worked as a DOC officer. In January and February 1986, Commonwealth Edison used fenthion to kill an estimated 270,000 starlings at its plant near Lake Sangchris State Park. However, several other wild and domestic animals, including some great horned owls and a mink, died from secondary poisoning when they preyed on the starlings.

Gibson wrote a series of articles about this incident. The fifth article, entitled "Legislation needed to avert another wildlife tragedy," accused Martin of taking two of the owls that died from fenthion poi-

soning to a taxidermist for stuffing to add to "his decor." In pertinent part, the article stated the following:

"But now sources report Conservation Police Officer Mike Martin sent 'his own owl,' found dead on New Year's Eve, to a taxidermist for stuffing for 'his decor.' Martin is reported to have sent a second owl to the same taxidermist. A dead mink, found with the first owl, was reportedly 'trashed.' Apparently it didn't fit in with the Martin's [*sic*] decor.

The DOC then sent Martin to take statements from the taxidermist and the veterinarians. Now that's covering your bases or something. The matter takes on more weight when it was left up to me to tell Temple Reynolds [the Director of the DOC Law Enforcement Division, who was on vacation during the fenthion crisis], after five weeks of 'investigation,' how long the DOC had really known a secondary wildlife kill was occurring."

(State Journal-Register, Feb. 28, 1986, at 29.)

Although the article did not so state, Martin's conduct as described in the article arguably constituted the crimes of official misconduct (Ill. Rev. Stat. 1985, ch. 38, par. 33—3) and possession of a protected bird of prey without a permit (Ill. Rev. Stat. 1985, ch. 61, pars. 2.4, 3.5). His conduct also would have violated several DOC regulations.

In July 1986, plaintiff sued the State Journal-Register and Gibson, claiming that the following four statements from Gibson's article libelled him: (1) that plaintiff took the first owl to a taxidermist; (2) that plaintiff sent a second owl to a taxidermist; (3) that plaintiff threw a dead mink in the garbage; and (4) that plaintiff did not faithfully and correctly fulfill his duties as an officer when he interviewed the taxidermist. Plaintiff further alleged that (1) he did not take the owls to a taxidermist, someone else did; (2) he did not throw a mink away; and (3) he "did take statements from the taxidermist and from all persons having contact with the owls in question." He also alleged that the only time he possessed the owls was when he confiscated them from the taxidermist (pursuant to orders from his supervisor) and brought them to the Springfield DOC office.

In addition, plaintiff claimed that Gibson failed to verify her sources by checking her story with the taxidermist, the people who found the dead owls, the University of Illinois (which tested the dead owls for fenthion poisoning), or plaintiff. Plaintiff alleged that as a result of Gibson's failure to verify her sources, she knowingly, intentionally, willfully, and maliciously published "false, scandalous and malicious libels concerning Plaintiff *** with the intent to injure Plaintiff's good name and *** reputation." In addition to general damages,

plaintiff sought $750,000 in punitive damages from Gibson and the State Journal-Register.

In June 1992, defendants moved for summary judgment under section 2—1005 of the Code. In support of their motion, defendants attached five affidavits. The first came from James Moak, who served as the Chief of the Wildlife Resources Division of the DOC at the time of the article. His affidavit confirmed the facts regarding the fenthion poisoning and Martin's connection to the owls. In pertinent part, it stated the following:

"As reported by Pam Fortado Gibson in The State Journal-Register, in early 1986 many species of wildlife, and some domestic animals, died in the area of the Commonwealth Edison Plant and the Lake Sangchris State Park. Great horned owls and other protected species of wildlife were killed. *** Pam Fortado Gibson investigated and reported this story. I spoke frequently with her in connection with this story. We discussed the importance of recovering sick and dead wildlife to test them as quickly as possible for poisoning ***. We discussed the fact that two great horned owls and a mink had been located at the Norris Hill Taxidermy Shop in Taylorville, that the Department had not been notified of the deaths of these predators, and that these carcasses had not been tested for fenthion poisoning.

*** Prior to publication of the February 28, 1986[,] article[,] Ms. Gibson requested that I explain to her the procedure for handling carcasses of protected species. I explained that there was a formal procedure, even in the absence of the fenthion crises [sic], and that collection permits and tags were required for the collection or transportation of protected species. *** Prior to the publication of the *** article, Ms. Gibson asked me whether the Division of Wildlife Resources had received a request for a permit relating to the two owls which were located at Norris Hill's Taxidermy Shop ***, and I informed her of my findings that no permits had been applied for or issued which would have allowed for the transportation of the owls. I then subsequently checked almost daily and found that no permit was ever applied for.

*** I investigated this matter at Ms. Gibson's request. *My investigation revealed that Conservation Police Officer Mike Martin had improperly authorized the collection and transfer of the owls to the Norris Hill Taxidermy Shop in Taylorville, to be prepared for decor, at the height of the fenthion crisis. I*

informed Ms. Gibson prior to the publication of the \*\*\* article that a conservation police officer does not have the authority to permit citizens to take possession and transport the carcass of a protected species, even in the absence of the fenthion crises [*sic*]. The Department immediately ordered the owls retrieved from the taxidermist and sent them for testing upon learning of their existence.

*\*\*\* Prior to the publication of the \*\*\* article, Ms. Gibson contacted me concerning the accuracy of her article. In a telephone conversation, she read to me the article in its entirety, prior to its publication. The article was truthful, and I verified and confirmed it. Mike Martin [had] referred to the owls as his own owls, I referred to the owls as 'Martin's own owls,' and I informed Ms. Gibson of these facts.*" (Emphasis added.)

The second affidavit came from Dan Troemper, the Chief of Public Lands for the DOC. He swore that on February 19, 1986 (over a week before the State Journal-Register published the article in question), Gibson asked him to investigate whether the taxidermist possessed the owls. Troemper stated that he phoned Norris Hill, the taxidermist, who told Troemper that he did have the owls, which Hill called "Martin's own owls." Troemper also stated that "Taxidermist Hill [also] said to me \*\*\* that a dead mink found with the first owl was 'trashed'." He added that he had referred to the owls as "Martin's owls" in several separate conversations, including one with Gibson. Troemper did not mention anything in his affidavit about Martin's alleged desire to use the owls for "his decor."

The third affidavit came from Charles Tamminga, who worked as the head of the DOC Public Information Division and was in charge of press releases and communications with the press. Tamminga swore that Gibson customarily contacted him regarding the factual accuracy of her articles before she published them, and that she did so regarding the February 28 article. She had read to him the entire article, and he "investigated its truth." He contacted Larry Closson (one of plaintiff's supervisors at the time) and Troemper, who told him that "two owls had been delivered to a taxidermist on Mike Martin's instructions." Tamminga therefore "[contacted] Pam Fortado Gibson and informed her that I had checked every part of her story and my investigation on behalf of the Department of Conservation could not refute or disprove her story."

The fourth affidavit came from Phil Chiles, a DOC employee who worked under Tamminga. He also swore that Gibson customarily checked the accuracy of her articles with him, and that she did so re-

garding the February 28 article. He added that he told her that people within DOC had referred to the owls as " 'Martin's owls,' in that he had authority over the owls in questions."

The fifth affidavit came from Rick Wenneborg, a minister of a church in Chatham. He swore that he spoke to an employee of the Chatham Veterinary Clinic from whom plaintiff had taken statements about the owls. The employee told Wenneborg that as plaintiff asked questions of the employee and others at the clinic, plaintiff had referred to the owls as " 'his owls.' " Wenneborg added that "[a] reference was also made to the effect that at least one owl was to be used in his 'decor' " and that he "relayed [all] the above information to Pam Fortado Gibson by phone later that same day."

Defendants also attached a transcript of Gibson's discovery deposition to their motion. In that deposition, Gibson testified that she had continued writing her column for the State Journal-Register until January 1991, when the managing editor cut her column. She testified that she had submitted the column weekly, and Ed Armstrong would edit it for grammar, syntax, and coherence. Although Armstrong would sometimes discuss with her the tact involved in writing about sensitive topics, he did not do so regarding the February 28 article because they did not consider it a sensitive topic. She added that Armstrong trusted her generally and thus did not often request her to verify her sources.

Regarding the February 28 article, Gibson stated in her deposition that she spoke to all of the people who provided the above affidavits and used them and others as sources for her article. In particular, Moak had told her that no one had obtained a permit to transfer the owls to the taxidermist (as required by law), and that plaintiff and others had referred to the owls as if they were plaintiff's own owls. She testified that Orville Gosnell and Dan Troemper told her that plaintiff planned to use the owls for "his decor." (The record does not reveal who Orville Gosnell was other than that he passed away prior to the litigation in this case.)

She also said that she spoke to Jim Helfrich, whom Gibson identified as "the second top man in [DOC]," about the article because she respected Helfrich's desire to not make "law enforcement look bad." She claimed that, despite these concerns, Helfrich suggested that she "go forward with the article," and that Helfrich told her that "he [had] checked it all out." She later added that Troemper, Chiles, and Tamminga—whom she identified as the three people responsible for DOC relations with the media—had all informed her that plaintiff had sent "his own owl" to the taxidermist. She also noted that she had

seen notes written by Mike Connalin—whom she identified as the acting head of the DOC Law Enforcement Division in Temple Reynolds' absence—that identified the owls as "Martin's own owls."

In response to defendants' motion for summary judgment, plaintiff submitted two affidavits. The first came from Larry Closson, the Chief of the DOC Law Enforcement Division, who swore that Gibson contacted him the week after she published the article, saying that she wanted to present plaintiff's side of the story in the next week's column because "she had printed her people's side" of the story. (The record does not reveal whether Gibson ever did publish "plaintiff's side" of the story.) Closson added that "Gibson said she felt that [plaintiff] had misused the word 'my' when referring to the owls and that her people interpreted that as meaning the owls were Martin's personally. She stated that *she knew for sure* that one was mounted for a school[,] but that she writes what her people told her." (Emphasis added.)

The second affidavit from plaintiff came from Al Mickelson, an employee who worked at the DOC during the time at issue. Mickelson swore that Gibson spoke to him at least three times before the article appeared in the State Journal-Register, speaking in terms that indicated that she thought the owls would be stuffed for a school, not for Martin's decor. Mickelson also swore that other information he received from her indicated that—independent of the fenthion crisis and the owl stuffings—Gibson did not like Martin and considered him a bad and dishonest conservation officer, thereby revealing a suggested bias Gibson held against plaintiff.

At the August 1992 hearing on their motion for summary judgment, defendants argued that the trial court should grant their motions because no genuine issue of material fact existed regarding *New York Times* malice, a required element of plaintiff's case. After considering the above affidavits and deposition, the trial court granted summary judgment for defendants, and plaintiff appeals that order.

## II. ANALYSIS

A court appropriately grants summary judgment when the pleadings, depositions, affidavits, and admissions on file reveal that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. (*Miller v. Danville Elks Lodge 332* (1991), 211 Ill. App. 3d 145, 151, 569 N.E.2d 1160, 1163.) When considering a motion for summary judgment, a court should interpret the record in favor of the party opposing the motion. (*Miller*, 211 Ill. App. 3d at 151, 569 N.E.2d at 1163.) Because a motion for summary judgment involves only

legal issues and does not require the trial court to use its discretion regarding fact-finding or assessing the credibility of witnesses, an appellate court reviews a trial court's grant of summary judgment *de novo* and affords the trial court's decision no deference. *Shull v. Harristown Township* (1992), 223 Ill. App. 3d 819, 823-24, 585 N.E.2d 1164, 1167.

■ In libel cases involving a reporter's comments about a public figure, the United States Supreme Court held in *New York Times* (376 U.S. at 279-80, 11 L. Ed. 2d at 706, 84 S. Ct. at 726) that the plaintiff must prove that the reporter published the material at issue with "actual malice." (See *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 418-19, 532 N.E.2d 790, 797.) *New York Times* "actual malice" exists if (1) the defendant knew that the statement was false, or (2) the defendant made the statement with reckless disregard as to its truth. (*Miller*, 211 Ill. App. 3d at 154-55, 569 N.E.2d at 1166.) If the plaintiff fails to prove *New York Times* "actual malice," then a qualified privilege protects reporters from libel lawsuits. Further, although the plaintiff need only prove the common law elements of libel by a preponderance of the evidence, the plaintiff must prove *New York Times* "actual malice" by clear and convincing evidence in order to overcome the reporter's qualified privilege. (*Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 244, 91 L. Ed. 2d 202, 209, 106 S. Ct. 2505, 2508.)

> "When determining if a genuine factual issue as to actual malice exists [at the summary judgment stage of a] libel suit brought by a public figure, a trial judge must bear in mind *** [that] there is no genuine issue [of material fact] if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254, 91 L. Ed. 2d at 215, 106 S. Ct. at 2513.

Even though almost 30 years have passed since the Supreme Court decided *New York Times*, confusion still exists over the "actual malice" standard, mostly because the Supreme Court unfortunately chose the term "malice" to describe the mental state a reporter must possess to lose his qualified privilege. The "dictionary" meaning of the term "malice"—"[t]he desire to harm others, or to see others suffer; ill will; spite" (American Heritage Dictionary of the English Language 790 (1975))—differs completely from the meaning given to it by the Supreme Court as a term of art in libel cases involving a reporter's comments about public figures. As commentators have noted, although "the Court used the word 'malice,' it was not referring to the old, common law libel meaning of 'malice' as hatefulness or ill will; [instead], from its defini-

tion, the Court meant *'scienter.'* " (4 R. Rotunda & J. Nowak, Treatise on Constitutional Law §20.33, at 202 (2d ed. 1992).) To avoid confusion, we will refer to "actual malice" under *New York Times* as *"New York Times* malice."

The confusion engendered by the Supreme Court's unfortunate choice of "malice" as a term of art appears in this very case. Plaintiff argues several irrelevant matters regarding Gibson's alleged bias, deficient reporting methods, and general lack of integrity. Regarding her bias, most of the facts in the affidavits submitted by plaintiff, as well as most of the arguments in plaintiff's brief, focus on proving that Gibson did not like plaintiff or, at a minimum, did not want him to be a conservation officer because she considered him dishonest and uncommitted. Plaintiff also focuses on portions of Gibson's deposition in which this ill will again manifests itself. However, none of these allegations pertains to whether Gibson made the statements at issue with *New York Times* malice. Gibson might very well have *hated* plaintiff—even though nothing in the record suggests she did—and thus wanted him removed from the DOC when she published the article in question, but such animosity would provide nothing more than a suggested *motive* behind her *New York Times* malice. More specifically, her ill will could not prove (or even suggest) that she published the statements in question either knowing they were false or with a reckless disregard for their truth.

As mentioned earlier, defendants attached to their motion for summary judgment several affidavits from people who all held positions of authority and knowledge regarding the incident at issue and who all swore in their affidavits that they served as sources for the article. The existence of these sources completely ends this matter. Indeed, Moak's affidavit provided perhaps the strongest defense possible to claims of *New York Times* malice wherein it stated the following: "In a telephone conversation, she read *** the article [to me] in its entirety, prior to its publication. *The article was truthful, and I verified and confirmed it."* (Emphasis added.)

We consider the existence of these affidavits, which reveal Gibson's sources, wholly dispositive. Even assuming that everything Gibson wrote in the article regarding plaintiff was *completely* false, plaintiff's complaint would rest with Gibson's *sources*, not Gibson or the newspaper.

Plaintiff suggests that Gibson actually suspected or should have known that her sources did not provide her with accurate information. However, *New York Times* malice does not incorporate mere suspicions or what a reporter *should have* known. Instead, it requires that the reporter *actually knew* that the information was false or acted with such

disregard for the truth as to rise to the level of *recklessness*. The record indicates that Gibson either believed her sources or—*at the worst*—merely suspected that they might not have provided her with the whole truth. This state of mind does not come close to *New York Times* malice.

Upon reviewing the record, we see only two items that relate to establishing *New York Times* malice. First, Closson swore in his affidavit that Gibson told him that she "knew for sure that one [of the owls] was mounted for a school [and not for plaintiff's decor,] but that she writes what her people tell her." Mickelson similarly swore that Gibson vaguely spoke in terms that indicated she knew the owls would be for "school usage." If Gibson had printed that plaintiff intended to use *both* owls for "his decor" while she *knew* that one would instead go to a school, then she would have published a statement while *knowing* it to be false, and thereby published it with *New York Times* malice.

However, Gibson wrote in the article only that plaintiff intended to use the *first* owl for "his decor," and then she added in a separate sentence that plaintiff sent another owl to the taxidermist without specifying why. Further, in her deposition, Gibson did not state that she knew which owl plaintiff intended to use for his decor, just that he intended to use "either one of the two" for his decor. The article is consistent with this interpretation, and therefore no *New York Times* malice exists with regard to her statement that plaintiff intended to use one of the owls for "his decor."

Second, Gibson testified in her deposition that she spoke to Bob Rose, in the "Division Headquarters of Lands," because she had heard that he held one of the owls. Apparently, she learned from him that Rose's grandson wanted to keep the bird. Gibson testified that Rose informed her that he thus planned, *pursuant to plaintiff's instructions*, to bring the owl to a taxidermist "to have this protected federal species stuffed *** to keep [Rose's] grandson from crying" about losing the bird. Combined with the above information that she allegedly knew that one owl would go to a school, this information provided some reason to believe that Gibson might have published the story knowing that someone *other* than plaintiff intended to use the second owl for "his decor."

However, when plaintiff's counsel confronted her on this matter, Gibson clarified that Orville Gosnell and Troemper had told her differently—namely, that Martin intended to use the owls for *his own* decor—and that Reverend Wenneborg had told her that he overheard some people talk about Martin using the owls for his decor. The question thus turns to whether these sources existed.

Plaintiff also argues that Gibson should bear responsibility for her deficient reporting methods in that she did not thoroughly check the ac-

curacy of the information her sources provided. Plaintiff suggests that Gibson owed a duty to contact the taxidermist, the University of Illinois (which conducted the fenthion poisoning tests), or plaintiff, himself, before publishing the article. We emphatically disagree.

■ Assessing *New York Times* malice in terms of how thoroughly a reporter checks the information a source provides to the degree plaintiff suggests would turn courts into editors, defining and describing the standards by which reporters perform their jobs. In the extreme, doing so could also effectively cut the public off from developing news stories that must—by their very nature—be reported on less than perfect information. If, as plaintiff suggests, courts require reporters to thoroughly check their facts so as to eliminate all doubt about their truth before going to print, such developing news stories would end up swallowed by the delay of this exhaustive investigation. We are confident that this reason is one which underlies the Supreme Court's holding that a reporter libels a public figure only when that reporter prints a story *knowing* it to be false or with a *reckless* disregard for its truth. These exacting terms are meant to guarantee that a reporter will not bear liability merely because that reporter's story turns out to be inaccurate.

Put bluntly, reporters *do not* and *cannot* guarantee the truth of their stories; instead, they serve as conduits through which information flows from the reporters' sources to the public. The first amendment protects the right of the press to so serve without fear of punishment from the government or from lawsuits brought by public figures who dislike the *information* a reporter's sources provided. Although good reporters exercise discretion and care in checking their facts, the first amendment sometimes requires us to suffer the consequences of irresponsible journalism. The alternative—that the courts become "super editors"—is both too heavy a price to pay and one which our Nation's Founders rejected.

### III. CONCLUSION

For the reasons stated above, we affirm the trial court's order granting judgment.

Affirmed.

McCULLOUGH and COOK, JJ., concur.