Renatta L. FRAZIER, et al., Plaintiffs,

v.

John W. HARRIS, et al., Defendants.

No. 03–3007.

United States District Court,
C.D. Illinois,
Springfield Division.

June 10, 2003.

A. Courtney Cox, Hart & Hart, Benton, IL, for Plaintiffs.

Frank Martinez, Robert M. Rogers, Office of Corporation Counsel, Bradley B. Wilson, Gates, Wise & Schlosser, P.C., Springfield, IL, for Defendants.

## ORDER

SCOTT, District Judge.

This matter comes before the Court on the Defendants' Motion to Dismiss. The Plaintiffs Renatta Frazier, Rickey B. Davis, Ralph L. Harris (Officer Harris), Donald F. Ewing, Jr., Melody E. Holman, Lea L. Joy, Cleo Moore, Larry Stelivan and Robert Williams are African–Americans. They are current or former police officers with the City of Springfield, Illinois, Police Department (Department). The Defendants are the City of Springfield, Illinois (City), Springfield Police Chief John W. Harris (Chief Harris), for-

mer Mayor Karen Hasara, Assistant Police Chief William Pittman, Assistant Police Chief Mary L. Vasconcelles, Police Lieutenant Mark Harms, and Police Legal Adviser William G. Workman. The Plaintiffs claim that the Defendants committed a series of acts of racial discrimination and retaliation, all of which violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII); and 42 U.S.C. §§ 1981, 1983, 1985 and 1986. Plaintiff Frazier also alleges that the Defendants committed other state law torts against her. The Plaintiffs have brought this action against the individual Defendants in both their individual and official capacities. The Defendants ask this Court to dismiss the Complaint for failure to state a claim. For the reasons set forth below, the Motion is allowed in part and denied in part.

### STATEMENT OF FACTS

For purposes of this Motion, the Court must accept as true all well-pleaded factual allegations contained in the Complaint and draw all inferences in the light most favorable to the Plaintiffs. *Hager v. City of West Peoria*, 84 F.3d 865, 868–69 (7th Cir. 1996); *Covington Court, Ltd. v. Village of Oak Brook*, 77 F.3d 177, 178 (7th Cir.1996). A claim should not be dismissed unless it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him or her to relief. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996).

Plaintiffs allege that the racial problems in the Department date back at least to the 1970's. At that time there were 25 African–American officers on a force of 150. By the time the Complaint was filed in January 2003, the Department had only 14 African–American officers on a force of 283. The percentage of African–American officers had dropped from 16 percent to slightly less than 5 percent. Plaintiffs allege that the Department has a practice of discriminating against African–Americans in hiring, promotion, discipline, and assignments. The Department now has no African–American: (1) sergeant; (2) drug enforcement agent; (3) undercover drug unit agent; (4) canine unit agent; (5) dispatch personnel; (6) police academy personnel; (7) SWAT Team personnel; (8) traffic unit personnel; or (9) gang unit personnel; and only one African–American detective. Each Plaintiff, except Williams, alleges specific acts to which he or she was subjected.[1] The allegations, which are presumed to be true for this discussion, are set forth below.

### LARRY STELIVAN

Larry Stelivan joined the Department in 1978. Stelivan was assigned to the traffic section for 10 years. He was then transferred to the operations section. At that time, he was assigned to ride with Defendant Pittman. Pittman was then a Field Training Officer. Pittman complained about Stelivan's report writing and caused him to go to report writing school. The instructor informed Stelivan that he did not need to go to report writing classes.

In 1998, Stelivan was involved in a disturbance at his home with his wife. Caucasian officers came to his home. Stelivan told the officers that his wife would probably say that he hit her, but he did not. Stelivan's wife told officers that nothing happened. The officers arrested Stelivan anyway because one officer said, "He said he hit her so arrest him." *Complaint*

---

1. The Complaint breaks down the allegations of discrimination by Plaintiff. The Complaint does not give dates for many of the alleged discriminatory acts; thus, the Court cannot place the various allegations in chronological order. The Court will organize the allegations by officer, starting with the Plaintiff Stelivan, the Plaintiff with the most years of service with the Department.

¶ 26.c.[2] His wife had to sign a statement at the Sangamon County, Illinois, State Attorney's Office stating that Stelivan did not hit her before the charges were dropped.

At some point, Stelivan's son became sick and needed a kidney transplant. Defendant Pittman told Stelivan that if he gave his son a kidney, Pittman would do everything he could to get Stelivan kicked out of the police pension system. Pittman was in charge of the Department's pension board at the time. Caucasian officers with one kidney were not removed from the police pension system. Stelivan does not allege that Pittman did anything to remove him from the pension system.

### RALPH HARRIS

Officer Harris also began working for the Springfield Police Department in 1978. Officer Harris was a principal organizer of the Black Guardians Association (BGA), a local chapter of the National Black Police Association. Officer Harris is a spokesman for equal treatment of African–American officers and applicants. He is the spokesperson for the BGA and was elected its president in 2001. He has spoken to officials of the United States Department of Justice regarding racial discrimination and retaliation toward African–American police officers by members of the Department, including Chief Harris. He has also complained about the Department's refusal to provide backup to African–American officers when problems arise while such officers are working at off-duty jobs. The Department provides such assistance to Caucasian officers who work off-duty jobs.

In the two years prior to filing the Complaint, Officer Harris has been the subject of numerous false disciplinary complaints. More complaints were filed against him in the last two years than were filed against him in the previous twenty. In October 2001, Officer Harris was written up for allegedly misusing sick leave. On June 18, 2002, he was informed of another complaint filed against him alleging misuse of sick time. Officer Harris was also charged with violating a Department rule against lying. These charges were false and were filed in retaliation for his opposition to racial discrimination. Caucasian officers who were found to have lied to secure a warrant have not been subjected to discipline.

As a consequence of Officer Harris' advocacy for African–American officers, he has been continually passed over for promotion to the position of sergeant, while less experienced and less qualified Caucasian officers have been promoted ahead of him.

### DONALD EWING

Plaintiff Donald Ewing joined the force in 1979. Ewing alleges that he has been treated differently than Caucasian officers with respect to the disciplinary process. Ewing was written up and suspended for a day because he was involved in a minor accident. Caucasian officers in similar situations either were not disciplined or were disciplined less harshly.

Ewing applied for the Detective Division on three occasions. Caucasians were selected for these positions based on biased and highly subjective interview processes. These officers who received the assignments had less time or experience than Ewing. In fact, Ewing trained many of them.

Ewing also applied and tested for the sergeant position. Ewing always scored low on the exam due to the Department's

---

2. Unless otherwise indicated, the paragraph references to the Complaint are to paragraphs in Counts I, II, and III of the Complaint. The paragraphs are repeated in each of these Counts.

testing procedures. Chief Harris gave study materials for the tests to Caucasian officers, but gave no such materials to African–American officers. When African–American officers were placed on the sergeant list, Chief Harris allowed the list to expire before appointing any African–American officers to the rank of sergeant.

Ewing and some other African–American officers worked off-duty at an establishment called Mac's Lounge. These off-duty officers were not given backup from the Department when problems arose. Plaintiff Joy was told by Caucasian sergeants and lieutenants not to provide assistance to officers working off-duty at Mac's Lounge. Caucasian officers in similar situations were given backup at other off-duty jobs.

Ewing opposed racial discrimination by Caucasian officers. He complained once that an officer, named Don Kolar, became physically aggressive toward an African–American prisoner. He also complained that Caucasian officers wore thin black leather gloves in African–American neighborhoods. These gloves were very intimidating to African–American citizens. When African–American officers expressed concerns about racial matters to Chief Harris, his response was, "I don't know why you all work there, you shouldn't want to put yourself in a position that you don't want to be in." *Complaint* ¶ 23.g. At another meeting regarding racial problems in the Department, Chief Harris threatened Ewing that the City would take his house. At the time Ewing was a Community Policing Officer; the City provided such officers with housing in the neighborhood to which they were assigned.

Ewing was appointed Neighborhood Police Officer for Springfield's east side area, an African–American neighborhood. Caucasian officers who previously held his position were given advance assistance to help them succeed in the position. Ewing was given no such assistance. Pittman told Ewing, "We know you will be the first one to fail at this position." *Complaint* ¶ 23.j. Ewing was also given more geographical area to cover than the prior Caucasian officers. Ewing succeeded at the position even without the typical assistance that Caucasian officers received.

Ewing at one point requested to be placed on a particular beat as his regular assignment. His request was denied; instead a Caucasian officer with less than one year of service was placed in that assignment.

### RICKEY DAVIS

Rickey Davis has been an officer for the Department since 1981. He has been a lieutenant for a year. He was promoted to the position of lieutenant primarily because of protests over the discriminatory manner in which the lieutenant's test was administered to favor certain Caucasian officers.

Davis has been president and thereafter vice president of the BGA. He, along with Officer Harris, has been active in advocating for equal treatment of African–American officers. He has also complained about the Department practice of not providing backup to black officers working off-duty.

As a result of his advocacy for African–American officers, Davis has been subjected to various types of discrimination. In 2001, he was disciplined for returning from his lunch break approximately 10 minutes late, while Caucasian officers who were also late were not disciplined. Davis was assigned to the third shift without being consulted about his shift preference; Caucasian lieutenants were not similarly treated. After a meeting on June 3, 2002, Davis was subjected to verbal abuse, vulgarities and threatening behavior by De-

fendant Pittman. Chief Harris was aware of the misconduct and did nothing to discipline or punish Pittman. Pursuant to Chief Harris' instructions, Defendant Vasconcelles and a Caucasian officer Lieutenant Patrick Fogleman followed Davis during his third watch shift on October 29, 2002.

Davis was criticized by Defendants Vasconcelles and Pittman for filing a complaint against a Caucasian police officer who used vulgar language toward an African–American citizen. Vasconcelles and Pittman asserted that lodging a complaint with the Department's Internal Affairs Division was inappropriate. Davis, however, was following proper procedures. Similar complaints against African–American officers for less severe conduct have been investigated by Internal Affairs.

On July 25, 2002, Defendant Chief Harris asked Davis why his reports for April, May, and June 2002, were late. Davis explained that one of his sergeants had marital problems and therefore had been late with the reports. On October 28, 2002, Davis discovered that this conversation had been deemed a counseling session, which is a type of discipline under Department personnel rules. Such discipline has a detrimental effect on Davis' opportunities for advancement and promotion within the Department. Davis has also been criticized for having a sergeant prepare monthly reports for him. Caucasian lieutenants have sergeants or other officers prepare their reports and have not been disciplined for this practice.

Davis had been passed over for positions within the Detective Bureau while Chief Harris has selected less experienced Caucasian officers for those positions.

*LEA JOY*

Plaintiff Lea Joy joined the Department in 1983. She was promoted to sergeant. Defendant Pittman said that as long as he was there, Joy would never "move up." *Complaint* ¶ 22.a. Joy was later promoted to position of lieutenant because of protests made by her and other African–American officers over the discriminatory manner in which the lieutenant's test was administered to favor certain Caucasian officers.

Joy has been subjected to numerous instances of racially discriminatory treatment and hostility. Caucasian officers referred to her as, "African Cunt." *Complaint* ¶ 22.b. Joy was written up almost every day and chastised about things that Caucasian officers would just be talked to about without any formal discipline. Joy consistently received the worst vehicles. She was not issued equipment that Caucasian officers were given. Caucasian officers refused to ride with her. She has had difficulty obtaining backup from Caucasian officers. While she was a sergeant, she was required to explain and justify her actions when Caucasian sergeants were not required to do so. Caucasian officers did not want to train with her.

Joy applied for various positions during her tenure at the Department. Caucasian officers treated those applications as jokes. Caucasian officers commented that she would never be allowed to hold any of the positions that she sought. Joy applied several times to the Canine Unit. One interviewer told her that he ranked her the highest, but she was not given the position. Joy applied to be a Fire Arms Training Simulator (FATS) instructor. She was the only applicant who was not accepted. She was the only African–American officer who applied.

At one point Joy was paid less than a Caucasian officer, Lieutenant Brunsman, who performed the same work as she.

When she complained to Chief Harris, he ignored her.

Joy was unfairly subjected to discipline at various times. She was written up for being sick. Caucasian officers were not written up under similar circumstances. The complainant told her that he was ordered to write her up. She was also written up for insubordination; again, Caucasian officers were not written up for similar conduct. At one point, Chief Harris threatened to charge Joy with lying. A Caucasian officer has not been charged for lying under Chief Harris, even when it has been recommended. Many times Joy has been ordered not to charge Caucasian officers who have lied.

Joy worked in Internal Affairs until Chief Harris ordered her transfer. He transferred her after she complained about the Department's treatment of Frazier. After the transfer, her authority was immediately curtailed. She became the Assistant Coordinator for the Hostage Negotiations Team. Chief Harris told Joy that she would be considered the Interim Assistant Coordinator, and was later told that a Caucasian officer would be considered for the position even though he had not applied for it.

## MELODY E. HOLMAN

Plaintiff Melody E. Holman was hired as an officer in 1987. In 1986, a lawsuit was filed to force the City to hire more African–Americans police officers. Holman was hired as a result of that suit. She was thereafter assigned to the Field Training Program. While she was on her initial one-year probationary period for new officers, she was on patrol with a Caucasian officer Mark Bridges. A Caucasian citizen asked Bridges, "How do I become a police officer with your Department?" Bridges responded, "You got to be black and you got to be a female," or words to that effect. *Complaint* ¶ 24.a. Holman was extremely

offended by the statement, which she perceived as racist and sexist. Because of her probationary status, however, she said nothing.

During her tenure she heard racist remarks about both Plaintiffs Frazier and Joy. She felt that she was in a racially hostile environment as a result. Several times she had been with both Caucasian officers and Plaintiff Frazier. The Caucasian officers had refused to speak to Frazier and had on occasion turned and walked away from Frazier.

## CLEO MOORE

Cleo Moore joined the Department in 1995. Moore perceived that she was subjected to a racially hostile environment. She observed Caucasian officers make derogatory comments about Plaintiffs Davis and Joy. She witnessed officers bypassing then Lieutenant Davis to ask questions of Caucasian sergeants. She came to believe that she could only be successful within the Department if she remained quiet and was seen as little as possible.

Moore applied for a detective position and was placed at the bottom of the list according to the Department's interview procedures. Caucasian officers who applied for the position were given advanced information concerning exam procedures and process; she was not provided with this information. This advance notice gave Caucasian officers an unfair advantage.

Moore also worked off-duty at Mac's Lounge. A Caucasian lieutenant, James Burton, falsely reported that several people were sitting in their vehicles outside the establishment smoking dope and drinking alcohol while off-duty African–American officers were standing around observing and doing nothing. Burton stated to the lounge owner that "you could get way more bang for your buck if you hired

different officers," or words to that effect. *Complaint* ¶ 25.f.

## RENATTA FRAZIER

Renatta Frazier was hired in August 2000. Like Holman, her hiring was a result of a lawsuit. This time, the NAACP filed a suit alleging that the City engaged in racially discriminatory hiring practices. Frazier was hired as part of the response to that lawsuit. Frazier was subjected to physical abuse during the time that she was on trainee status at the Department. Following her probationary period, Frazier continued to be subjected to racial harassment, discrimination, and retaliation from members of the Department's command structure. Ranking officers regularly spoke to her in a hostile and humiliating manner. She was denied the opportunity to participate in recruitment activities while on probation, but similarly situated Caucasian probationary officers were permitted to do so. She was denied the opportunity to work off-duty. She was required to work through dinner breaks. She was called names such as the, "poster child for the NAACP." *Complaint* ¶ 19.d.

Beginning on August 6, 2001, Frazier was subjected to a series of false Internal Affairs investigation complaints. Defendants Chief Harris, Pittman, Vasconcelles, Harms, and Workman subjected her to these complaints with the intent to force her to resign from the Department. On August 6, 2001, she was subjected to an Internal Affairs complaint regarding a traffic stop that occurred on August 2, 2001. On November 2, 2001, Frazier was subjected to a second Internal Affairs complaint. Frazier was accused of failing to perform her duties properly on October 31, 2001; she was accused of failing to prevent a rape of a Caucasian police officer's daughter by an African–American man because she did not respond promptly to a dispatch call to the location where the rape occurred. This was untrue; the alleged rape occurred before Frazier was dispatched.

The false accusation created a racially hostile environment for Frazier. An internal email that circulated throughout the Department indicated that Frazier had allowed the rape to occur. Local news media reported the accusation to the public. Defendants Chief Harris, Pittman, Vasconcelles, Harms, Workman, and others at the Department knew these reports were false but did nothing to correct them. The Defendants allowed this false information to remain in the public arena for the purpose of creating a racially hostile atmosphere for Frazier in order to force her to resign.

Chief Harris three times falsely told Carl Madison, the head of the local NAACP chapter, that the Department was investigating to determine whether Frazier could have prevented the rape. Chief Harris knew these statements about Frazier were false because he and others in the Department already knew that she could not have prevented the alleged rape. The Department therefore was not investigating for the purpose of making this determination. Pittman was present at the meeting in which Chief Harris made the false statements and said nothing to correct the false statements.

The false accusations, continued racial harassment, and retaliatory treatment created such stress that Frazier was forced to take an unpaid medical leave of absence on November 7, 2001. She never returned to work for the Department.

On November 28, 2001, a third false Internal Affairs complaint was filed against Frazier. The complaint alleged that she failed to handle a situation at a gas station while working off-duty. Frazier was not advised of the complaint until February 21, 2002. On May 7, 2002, Fra-

zier was subjected to a fourth Internal Affairs complaint regarding incidents that occurred while she and her family were evicted from their apartment on April 29, 2002.

During the course of the April 29, 2002, eviction, numerous Caucasian Springfield police officers were present, including Defendant Pittman. The Sangamon County Sheriff's Department conducted the eviction. During the eviction, the Caucasian Springfield police officers sat by and laughed while Frazier's belongings were thrown into the street. Plaintiff Davis offered to pay Frazier's rent, but the landlord refused; the landlord was told by a Caucasian officer from the Department that, "once we start the eviction we have to finish it". *Complaint* ¶ 19.j.

On July 3, 2002, Defendant Chief Harris ordered Frazier to appear at an Internal Affairs interview on July 10, 2002, regarding the Internal Affairs complaints that had been filed against her, dating all the way back to the August 6, 2001, traffic stop complaint. Chief Harris told her that failure to attend could result in disciplinary actions up to and including termination. Chief Harris, Vasconcelles, Harms and Workman were all advised that Frazier's physicians had told her not to participate in the interview because of her ongoing diagnosis of depression. Chief Harris refused to rescind the order for her to appear.

On July 10, 2002, Frazier appeared at the interview despite her physician's instructions. The interview was conducted by Vasconcelles and Harms with the assistance of Workman. The interview was not conducted in accordance with Department regulations. The interview procedures used were not fair and impartial, but were designed for the purpose of either justifying the discharge of Frazier or causing her resignation. After the interview, Frazier was forced to return immediately to her physician for further treatment. As a result of all this pressure, Frazier was forced to resign from her position as a police officer with the Department on September 3, 2002.

One week later, on September 10, 2002, Shawn Greene was arrested and charged with the rape that had allegedly occurred on October 31, 2001. Chief Harris intentionally delayed the arrest until after Frazier resigned from her position. Thereafter, news media outlets discovered that the rape had occurred before Frazier was dispatched to the scene, rather than after. Defendant Mayor Karen Hasara refused to discipline Defendant Chief Harris after she discovered that Chief Harris and others had known the earlier media reports were false, but did nothing to correct them.

On November 5, 2002, on the order of Mayor Hasara and Chief Harris, and through the office of Defendant Workman, numerous confidential documents pertaining to Frazier were improperly released to the news media and the public without Frazier's consent in violation of regulations, orders and rules of the Department.

## ANALYSIS

Based on these allegations, the Plaintiffs have filed five Counts against the Defendants. Count I asserts claims for racial discrimination in employment in violation of Title VII. Count II asserts claims for racial discrimination in violation of Plaintiffs' rights to equal protection pursuant to 42 U.S.C. §§ 1981 and 1983. Count III asserts claims for conspiracy to violate the Plaintiffs' rights under 42 U.S.C. §§ 1985 and 1986. Count IV alleges a claim by Frazier under Illinois law against all Defendants for infliction of emotional distress. Count V alleges a claim by Frazier under Illinois law against Chief Harris and

Pittman for tortiously placing Frazier in a false light before the public. Defendants moved to dismiss all of these claims.

## I. *OFFICIAL CAPACITY CLAIMS*

Before discussing each Count separately, the Court dismisses all claims against the individual Defendants in their official capacities. The claims against the individual Defendants in their official capacities are essentially claims against the City. *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). As such, the official capacity claims are redundant to the separate claims expressly alleged against the City.

Plaintiffs ask the Court not to dismiss the official capacity claims against the individual Defendants to facilitate discovery. The Court will not require individuals to continue to be subject to a lawsuit merely to ease discovery. The Plaintiffs can discover information from Defendants even if they are dismissed from the case. The official capacity claims are dismissed. The Court will now address the five Counts in order.

## II. *COUNTS I & II*

Plaintiffs are each pursuing Title VII and §§ 1981 and 1983 claims against the Defendants under three theories of employment discrimination: (1) disparate treatment based on race; (2) a racially hostile work environment; and (3) retaliation. The *prima facie* elements of these three theories of employment discrimination are substantially identical under Title VII, § 1981 and § 1983. *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998); *Riordan v. Kempiners,* 831 F.2d 690 (7th Cir.1987); *Hunter v. Allis Chalmers Corp.,*

*Engine Div.,* 797 F.2d 1417, 1420 (7th Cir. 1986).[3]

Title VII claims, however, can only be brought against the corporate employer and not against any individual supervisor or manager. *Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1168 (7th Cir.1998). Each Plaintiff also must first file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) or the Illinois Department of Human Rights. Each Plaintiff must then receive authorization from the EEOC to file a civil action (called a right to sue letter), and each must then file suit within the next 90 days. 42 U.S.C. § 2000e–5(f). Each Plaintiff may assert Title VII disparate treatment and retaliation claims based on discrete actions that occurred within the 300 days preceding the date on which each filed his or her charge of discrimination with the EEOC. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110–11, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). *See* 42 U.S.C. § 2000e–5(e)(the time frame is 300 days because Illinois has a state agency, the Illinois Department of Human Rights, which provides a state process to remedy employment discrimination). Under certain circumstances, hostile work environment claims may be based on actions that occurred more than 300 days prior to the date that the charge of discrimination was filed. *Id.* at 115–16, 122 S.Ct. 2061.

Sections 1981 and 1983 claims require separate, additional allegations to establish each Defendant's liability. The claims against the City must contain allegations that establish a basis for municipal liability. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

---

**3.** The *Hunter* case was abrogated by *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The Congress, however, amended § 1981 in the

Civil Rights Act of 1991 to overrule the *Patterson* decision. The *Hunter* decision, therefore, should now be good law.

The claims against the individual Defendants in their individual capacities require allegations that each directly participated in the wrongful conduct or that the conduct occurred with each Defendant's knowledge and consent. *Rascon v. Hardiman,* 803 F.2d 269, 273–74 (7th Cir.1986). The allegations in Counts I and II set forth adequate claims for some of the Plaintiffs against some of the Defendants under one or more of these three theories.

### A. *Disparate Treatment*

To state a disparate treatment claim, each Plaintiff must allege that the Defendants intentionally discriminated against him or her because of that Plaintiff's race, and each suffered an adverse employment action as a result. *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998). An adverse employment action is an action that imposes a materially adverse change in the conditions of employment, such as termination, demotion, denial of promotion, decrease in compensation, material loss of benefits, or significantly diminished responsibilities. *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996). Each Plaintiff may prove a disparate treatment claim through a direct or indirect method. *Hasham v. California State Bd. of Equalization,* 200 F.3d 1035, 1044 (7th Cir.2000). At the pleading stage, however, each Plaintiff does not need to allege the method of proof. Each must only make a short and plain statement of the claim showing that each is entitled to relief. *Fed. R.Civ.P.* 8(a); *Bennett,* 153 F.3d at 518 (An allegation as simple as, "I was turned down for a job because of my race," may state a claim under both Title VII and § 1983). Reading all the allegations in the light most favorably to each Plaintiff, Plaintiffs Frazier, Davis, Officer Harris, Ewing, Joy and Moore state claims for disparate treatment.

### 1. *Frazier*

Frazier alleges that the City constructively discharged her because of her race. A constructive discharge occurs if working conditions are so intolerable as a result of unlawful discrimination that a reasonable person would be forced into an involuntary resignation. *Vitug v. Multistate Tax Com'n,* 88 F.3d 506, 517 (7th Cir.1996). Frazier's allegations of mistreatment could reach that level. She therefore states a claim.

### 2. *Davis*

Davis alleges that he was passed over for a position in the Detective Bureau in favor of a less qualified Caucasian. At this point, the Court cannot ascertain whether this is an adverse employment action because the Court cannot determine whether the position in the Detective Bureau would have been a promotion or some other material improvement of Davis' conditions of employment, rather than a lateral transfer. A denial of promotion or other material improvement of conditions of employment would be an adverse employment action. *Smart,* 89 F.3d at 441. Reading the facts in the light most favorably to Davis, the Court must assume that the denial of the position could constitute an adverse employment action and thus it will allow the claim to continue. *See Hill v. American General Finance, Inc.,* 218 F.3d 639, 644–45 (7th Cir.2000). If that is not a correct assumption, then of course the Defendants may move for summary judgment on that issue later.

Davis also alleges that he was subjected to a counseling session by Chief Harris which had a negative effect on his career. Normally, disciplinary actions or negative evaluations do not constitute adverse employment actions. *Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996). If the disci-

pline reduced the employee's regular compensation or significantly diminished the employee's responsibilities, however, then the discipline can be an adverse employment action. *Id.* Again, reading the allegations in the light most favorably to Davis, the Court cannot say at this point that Davis could prove no set of facts to establish that the discipline was an adverse employment action.[4]

### 3. *Officer Harris*

■ Officer Harris states that he was passed over for promotion to the position of sergeant in favor of less qualified Caucasians because he is African–American. This states a claim. *Bennett,* 153 F.3d at 518.

### 4. *Ewing*

■ Ewing alleges that he was discriminated against in his efforts to secure a position in the Detective Bureau and to become a sergeant. He alleges that the interview for the Detective Bureau was biased. He alleges that Chief Harris aided Caucasian officers taking the sergeant's test by giving them study materials in advance, but did not give such materials to him. As a result he scored lower on the test. If true, such biased procedures in favor of Caucasian officers and against Ewing may constitute disparate treatment because he is an African–American. The Court again assumes for purposes of this Motion only that denial of a position in the Detective Bureau was an adverse employment action.

### 5. *Joy*

■ Joy alleges that she was denied the opportunity to join the Canine Unit and become a FATS instructor. Caucasian of-

ficers joked that she would never be allowed to hold such positions. Defendant Pittman said that she would never move up while he was in the Department. Based on the Complaint, a jury could conclude that she was denied these positions because she is an African–American. If the positions constitute promotions, she may be able to establish that she suffered an adverse employment action because of her race.

### 6. *Moore*

Moore attempted to become a detective. She ended up on the bottom of the list after the interviews. However, Caucasian officers were given advance help prior to the interviews. Such manipulation of the interview process in favor of Caucasians and against Moore could constitute an adverse employment action. This again will depend on whether she can establish that becoming a detective constitutes a promotion. Again, for purposes of the Motion to Dismiss, the Court will assume that becoming a detective would be a promotion.

### 7. *Williams, Stelivan, and Holman*

■ Williams, Stelivan, and Holman do not allege that they suffered any adverse employment actions. Stelivan and Holman suffered various indignities, but the alleged wrongdoing does not meet the definition of adverse employment actions. Williams alleges no actions taken against him. He does not state a claim.

### B. *Hostile Work Environment Claim*

To state a claim for hostile work environment discrimination, each Plaintiff must allege that: (1) he or she was sub-

---

**4.** Other Plaintiffs complain about discipline, but none alleges that the discipline had any adverse effect on his or her career.

jected to unwelcome harassment; (2) the harassment was based on race; and (3) the harassment was so severe and pervasive as to alter the conditions of his or her employment and created a hostile or offensive work environment; and (4) there is a basis for liability of the Defendants. *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998); *Hunter,* 797 F.2d at 1420–21. The harassment must be so severe and pervasive that the Plaintiffs' working conditions thereby become, "hellish." *Rogers v. City of Chicago,* 320 F.3d 748, 752 (7th Cir.2003).

For purposes of Title VII, the City's liability depends on the relationship between the injured party and the individuals committing the harassment. If the harassment came from a supervisor, then the City is liable, unless the City can establish an affirmative defense. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). If the harassment came from a co-worker, a plaintiff must show that the supervisors had notice of the wrongful conduct and failed to take prompt and appropriate corrective action reasonably likely to prevent harassment from recurring. *Tutman v. WBBM–TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1048 (7th Cir.2000).

### 1. *Frazier*

■ Frazier states a claim for hostile work environment discrimination. Frazier claims that her superiors at the Department subjected her to repeated acts of overt hostility. She alleges that she was called the "poster child for the NAACP." She alleges that Chief Harris, Harms, Pittman, Vasconcelles and Workman knew that false allegations that she had failed to prevent a rape were spreading throughout the Department and the community, but did nothing to correct these falsehoods. She alleges that these Defendants used the Internal Affairs investigations to harass her. These allegations assert that her superiors within the Department either subjected her to a pervasive racially hostile atmosphere that affected the conditions of her employment or were on notice of such treatment and took no action to stop it. She states a claim.

### 2. *Officer Harris, Joy, Holman and Moore*

■ Officer Harris, Joy, Holman, and Moore allege that their co-workers subjected them to a racially hostile work environment. Officer Harris alleges that in the last two years he has been subjected to an unusually large number of racially motivated disciplinary complaints. Depending on the circumstances, these complaints could possibly have been so severe and pervasive as to constitute a hostile work environment. Officers referred to Joy as "African Cunt". Co-workers made fun of Joy and made derogatory statements about her. Caucasian officers showed Joy no respect even though she was a sergeant. Moore felt that the environment was so racially hostile that she changed her behavior at work; she believed that she had to be quiet and seen as little as possible. Holman also alleges that she was subjected to a racially hostile environment. The allegations of these four Plaintiffs are minimal, but sufficient under federal notice pleading standards to allege that co-workers subjected them to a hostile work environment. *Fed.R.Civ.P.* 8(a); *Bennett,* 153 F.3d at 518. The Court notes, however, that each of these Plaintiffs must present evidence at the appropriate point in this proceeding that shows that the hostile and abusive environment was so severe that their situation was as "hellish" as the reviewing courts have required to proceed with such a claim. *Rogers,* 320 F.3d at 752.

The Complaint also indicates that the Department had notice of co-worker racial hostility but did not take prompt action to alleviate the situation. Joy, Davis, Ewing and Officer Harris all allege that they protested the treatment of African–American officers. These complaints may have put the Department on notice of the hostile atmosphere to which Officer Harris, Joy, Holman and Moore were subjected. The Complaint alleges that Chief Harris ignored these protests. The Complaint alleges that then Mayor Hasara repeatedly stated publicly that racism existed in the Department. This allegation may also show that Plaintiffs' supervisors in the Department were on notice and failed to take appropriate actions. Officer Harris, Joy, Holman, and Moore thus state a claim for hostile work environment discrimination.

3. *Davis, Ewing, Williams, and Stelivan*

■ The other Plaintiffs do not allege pervasive hostile and abusive working conditions. They allege some isolated comments or acts of retaliation by various individuals, but they do not allege that the comments or acts were so hostile and pervasive as to constitute a hostile work environment. Davis, Ewing, Stelivan, and Williams do not state a cognizable claim for hostile work environment.

C. *Retaliation Claim*

Title VII and §§ 1981 and 1983 prohibit retaliation against individuals who oppose racial discrimination. 42 U.S.C. § 2000e-3(a); *Hunter*, 797 F.2d at 1420. Retaliation occurs when the defendant subjects the plaintiff to an adverse employment action because the plaintiff has opposed discriminatory practices. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640 (7th Cir.2002).

1. *Davis, Officer Harris, and Joy*

■ Davis, Officer Harris, and Joy state claims for retaliation. These officers allege that they opposed racial discrimination and suffered adverse employment actions in retaliation for that advocacy. Davis and Officer Harris allege that they spoke out as leaders of the BGA and were denied promotions because of their advocacy. Joy alleges that she was transferred, and her responsibilities were curtailed when she complained to Chief Harris about the treatment of Frazier. Joy must establish that the move significantly reduced her responsibilities and was not merely a lateral transfer. *Hill*, 218 F.3d at 644–45; *Smart*, 89 F.3d at 441. For purposes of this Motion, the Court must assume that Chief Harris subjected Joy to such a reduction in responsibilities because of her opposition to Frazier's treatment. Davis, Officer Harris, and Joy thus may proceed on retaliation claims.

2. *Frazier, Ewing, Moore, Holman, Stelivan and Williams*

■ The other Plaintiffs do not state a claim for retaliation. Frazier, Ewing, and Moore each allege that he or she suffered an adverse employment action, but none alleges that an adverse employment action was in response to any opposition to discriminatory employment practices. Plaintiffs Holman, Stelivan, and Williams do not allege that they suffered adverse employment actions. They, therefore, do not state a claim under this theory.

D. *Sections 1981 and 1983 Municipal Liability*

■ The Plaintiffs must also allege a basis for municipal liability to recover from the City under §§ 1981 and 1983. The Plaintiffs must allege that: (1) the City had an express policy to discriminate, (2) the City had a widespread custom or prac-

tice to discriminate, or (3) a person with final policymaking authority committed the act of discrimination. *Kujawski v. Board of Com'rs of Bartholomew County*, 183 F.3d 734, 737 (7th Cir.1999). The Plaintiffs have alleged a widespread custom or practice of racial discrimination. They allege that Mayor Hasara stated that there is racism in the Department. They allege that Chief Harris manipulated interviewing and testing processes to favor Caucasians and discriminate against African–Americans. They allege numerous acts of racially motivated conduct by Caucasian officers. At this point, the Court cannot conclude that the Plaintiffs will be unable to prove a set of facts that establish that a custom or practice of racial discrimination existed within the Department. The Plaintiffs, therefore, allege a basis for municipal liability under §§ 1981 and 1983.

### E. *Individual Liability under Sections 1981 and 1983*

Each Plaintiff must also allege that each Defendant was personally involved in the acts of discrimination in order to state claims under §§ 1981 and 1983 against individual Defendants. Each Defendant either must have directly participated in the wrongful conduct or allowed the conduct to occur with his or her knowledge and consent. *Rascon*, 803 F.2d at 273–74.

#### 1. *Frazier*

■ Frazier alleges that Defendants Chief Harris, Pittman, Vasconcelles, Harms, and Workman personally participated in the efforts to harass her and to force her to resign because of her race. She therefore states a basis for personal liability against each of these individual Defendants in his or her individual capacity.

#### 2. *Davis, Ewing, and Joy*

■ Davis, Ewing, and Joy all allege that Chief Harris personally took actions to discriminate against them. Ewing alleges that Chief Harris manipulated interview and testing procedures to favor Caucasians and discriminated against him in his efforts to become a sergeant. Joy alleges that Chief Harris transferred her in retaliation for her opposition to the treatment of Frazier. Davis alleges that Chief Harris improperly characterized a conversation as a disciplinary "counseling session." These may constitute sufficient personal involvement by Chief Harris. Davis, Ewing, and Joy do not allege acts by any other individual Defendants that would subject those Defendants to liability under §§ 1981 and 1983.

#### 3. *Holman, Officer Harris, Moore, Stelivan, and Williams*

■ The other Plaintiffs do not allege that any individual Defendant committed any act of discrimination. They allege some improper comments or actions, but none of the actions alleged by Holman, Moore, Stelivan, or Williams reach the level of either adverse employment actions or hostile or abusive behavior that would constitute part of a hostile work environment. Officer Harris has alleged actions deemed at this stage to constitute a hostile work environment, for the complaints filed against him by the Springfield Police Department in the past two years, but he did not allege that any particular Defendant made those complaints.

#### 4. *Defendant Mayor Hasara*

■ No party states a claim against Mayor Hasara personally. No one alleges that she personally did anything that would constitute disparate treatment, hostile work environment or retaliation. Frazier alleges that Hasara, after the fact,

ratified the conduct. That is not sufficient. She must have consented to the conduct at the time. *Rascon*, 803 F.2d at 273–74. Frazier also alleges that Hasara improperly released confidential information about Frazier. The release of information, however, was not an adverse employment action, and Frazier does not allege that the release contained racially hostile or abusive information that could create a hostile work environment. Counts I and II are dismissed against Mayor Hasara.

#### F. *Summary of Counts I and II*

Thus, with respect to Counts I and II:

(1) Frazier states a claim for disparate treatment and hostile work environment against the City and all of the individual Defendants except Mayor Hasara;

(2) Davis states a claim for disparate treatment and retaliation against the City and Chief Harris;

(3) Officer Harris states a claim for disparate treatment, hostile work environment, and retaliation against the City;

(4) Ewing states a claim for disparate treatment against the City and Chief Harris;

(5) Joy states disparate treatment, retaliation, and hostile work environment claims against the City, and a retaliation claim against Chief Harris;

(6) Holman states a claim for hostile work environment against the City;

(7) Moore states a claim for disparate treatment and hostile work environment against the City; and

(8) Stelivan and Williams do not state claims.

### III. *COUNT III*

Count III alleges that the Defendants conspired to violate the Plaintiffs' civil rights in violation of 42 U.S.C. § 1985, and a related claim under § 1986. To state a claim, the Plaintiffs must allege: (1) an agreement between two or more persons, (2) to deprive the Plaintiffs of their constitutional rights, (3) some overt act in furtherance of the agreement, and (4) injury. *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir. 1999).

#### A. *The City's Liability*

■ The Plaintiffs fail to state a claim against the City because corporate entities, such as the City, do not make agreements with their employees; rather, they act through those employees. Thus, there can be no intra corporate conspiracy between a legitimate corporate entity and its employees who act within the scope of their employment. *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 111 (7th Cir.1990). A conspiracy by the City is not established even if the individual Defendants engaged in multiple acts designed to deprive a Plaintiff of his or her rights. *Id.*

If the individual Defendants conspired to act outside the scope of their employment, then the City had no part in the wrongful conduct. An employee acts within the scope of employment if the actions: (1) are of the type that he is employed to perform, (2) occur substantially within the authorized time and space limits, and (3) are actuated, at least in part, by a purpose to serve the interests of the employer. *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir.1992). An employee acts outside the scope of his employment if he acts purely for his own personal benefit and not to further any goal or purpose of the employer. *Deloney v. Board of Educ. of Thornton Tp.*, 281 Ill.App.3d 775, 784, 217 Ill.Dec. 123, 666 N.E.2d 792, 798 (1996). The alleged wrongful conduct (discriminatory Internal Affairs investigations, sup-

pression of information contained in police reports, failure to correct false information disseminated throughout the Department and the community) occurred within the context of duties which the individual Defendants were employed to perform (*e.g.* conducting internal affairs investigations, writing police reports, and disseminating Department information). The acts also occurred within authorized time and space limits of the Defendants' work. Frazier can only prove that the acts were outside of the scope of employment if she can establish that the individual Defendants acted purely for their own personal benefit. If so, then the City's interests were not considered and the City was not part of the conspiracy.

An intra corporate conspiracy can exist for purposes of §§ 1985 and 1986 if the corporate entity's sole purpose is to engage in illegal conduct. *Travis,* 921 F.2d at 110; *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972). Plaintiffs do not allege that the City's sole purpose is to engage in racial discrimination. Thus, the Plaintiffs fail to state a claim against the City in Count III.

### B. *The Individual Defendants' Liability*

██ The individual Defendants may have engaged in a conspiracy if they agreed to act outside the scope of their employment to deprive the Plaintiffs of their constitutional rights purely to further the individual Defendants' racially motivated animosities toward the Plaintiffs. *Hartman v. Board of Trustees of Community College Dist. No. 508, Cook County, Ill.,* 4 F.3d 465, 470 (7th Cir.1993); *Volk v. Coler,* 845 F.2d 1422, 1435 (7th Cir.1988). Frazier may possibly be able to establish

that the individual Defendants, other than Hasara, conspired against her outside the scope of their employment to manipulate the disciplinary process in order to interfere with her civil rights. She alleges that they intentionally subjected her to coercive disciplinary procedures based on false allegations to force her to resign from the Department. They purposefully withheld information that could have cleared her of the charge that she failed to prevent a rape. The Court is not convinced that Frazier can prove no set of facts to establish that the individual Defendants (other than Hasara) agreed to take these actions based purely on their personal animus toward her as an African–American woman and with no purpose or intent to further the interests of the City. The Court, therefore, will not dismiss Frazier's claim under §§ 1985 and 1986 against the individual Defendants other than Hasara.[5]

The other Plaintiffs do not state a claim under this Count. None of them allege an agreement between two individual Defendants. Davis, Ewing, and Joy allege that Chief Harris engaged in discriminatory conduct, but none alleges that he agreed with any other Defendant to engage in this conduct. They, thus, fail to state a claim under Count III.

### IV. *COUNT IV*

██ Frazier alleges a state law claim against all of the Defendants for infliction of emotional distress. She alleges both negligent and intentional infliction of emotional distress. The Defendants have asserted a number of defenses against this claim. Reading the allegations in the light most favorably to Frazier, she may proceed with a claim for intentional infliction of emotional distress against the individual

---

**5.** The Court recognizes that this theory may possibly be inconsistent with the Plaintiffs' claim that the Department had a custom and practice of engaging in racial discrimination. Plaintiffs, however, can plead inconsistent theories. *Fed.R.Civ.P.* 8(e)(2).

Defendants other than Hasara; however, she must establish that the individual Defendants acted outside the scope of their employment.

The Illinois Tort Immunity Act (Immunity Act) bars most of Frazier's theories of infliction of emotional distress. Under the Immunity Act, an employee is only liable for his own tortious conduct; there is no liability based on *respondeat superior.* 745 ILCS 10/2–204. There is absolute immunity for discretionary acts such as those alleged here if they were performed within the scope of employment. 745 ILCS 10/2–201. Frazier alleges that the individual Defendants, other than Hasara, abused the disciplinary process as a means to inflict emotional distress upon her. They pursued investigations of false claims. They did not correct false information in the media. They forced her to attend disciplinary hearings when they knew she was sick. All of these activities involve the exercise of discretion. Such abuses of discretionary power by municipal employees are immune from liability under Illinois law if they were performed within the scope of employment. *Village of Bloomingdale v. CDG Enterprises, Inc.,* 196 Ill.2d 484, 494, 256 Ill.Dec. 848, 752 N.E.2d 1090, 1098 (2001). The City is also immune because the individual employees are immune. 745 ILCS 10/2–109.

Frazier argues that Illinois courts recognize a common law exception to tort immunity if the Defendants did not act in good faith. The Court disagrees. The Illinois Supreme Court determined that, after the passage of the 1970 Illinois Constitution, common law exceptions to Illinois municipal tort immunity no longer existed. The face of the Immunity Act controls the extent of the immunity. The Illinois Supreme Court specifically held that the cases that imposed a good faith requirement failed to understand the significance of the 1970 Constitution. *Village of Bloomingdale,* 196 Ill.2d at 498, 256 Ill. Dec. 848, 752 N.E.2d at 1100. Thus, to the extent that Frazier claims the individual Defendants misused their discretionary power within the scope of their employment with the City, they are immune from liability.

Frazier states a claim in Count IV only against the individual Defendants and only for intentional infliction of emotional distress through actions taken outside of the scope of their employment. Immunity only exists for acts done within the scope of employment. 745 ILCS 10/2–201. Frazier may proceed on the narrow claim that the individual Defendants (other than Hasara) intentionally inflicted emotional distress upon her through actions that were performed outside the scope of their employment.

■ Frazier's negligent infliction of emotional distress claim in Count IV is barred by the Immunity Act because the negligence alleged would relate to actions performed within the scope of employment. Negligence requires a relationship between the parties that gives rise to a duty. *LaFever v. Kemlite Co., a Div. of Dyrotech Industries, Inc.,* 185 Ill.2d 380, 388, 235 Ill.Dec. 886, 706 N.E.2d 441, 446 (1998). The only alleged relationship between Frazier and the individual Defendants that would give rise to a duty is their mutual employment within the Department. The negligent tortfeasor must also breach that duty carelessly or accidentally, rather than intentionally or maliciously. *Dornhecker v. Ameritech Corp.,* 99 F.Supp.2d 918, 931 (N.D.Ill.2000). An unintentional or accidental failure to perform a duty as an employee would necessarily be within the scope of employment and so would be protected from liability by the Immunity Act.

The individual Defendants argue that Frazier only alleges a claim against them as agents of the City. Frazier uses language to that effect. *Complaint (d/e 1)* Count IV ¶¶ 54–55. She also alleges, however, that she is suing each individual Defendant in his or her individual capacity and that the individual Defendants personally participated in the outrageous conduct. *Complaint (d/e 1)* Count IV ¶¶ 5–10, 35–40, 46–50. Based on these allegations, the Court cannot say at this time that Frazier can prove no set of facts that would establish that the individual Defendants committed the alleged wrongful acts outside the scope of their employment. She, therefore, may proceed with this claim.

Workman argues that he is not liable because he acted as an attorney for the Department and not Frazier, and thus owed no duty to Frazier. That argument only relates to negligence claims. As set forth above, Frazier cannot proceed on her negligence claims. Workman can be liable if Frazier can prove that he intentionally inflicted severe emotional harm upon her solely out of his own personal self-interest with no thought of furthering the interests of the City.

Workman also claims that Frazier does not allege any intentional conduct by him. The Court disagrees. Frazier alleges that he personally participated in the unfair interview on July 10, 2002. She alleges that he knew that her doctor advised her not to participate in the interview. She alleges that he participated in the interview anyway. She alleges that Workman and the others designed the interview to inflict emotional distress upon Frazier and to force her to resign. She has sufficiently alleged that he personally participated in the alleged wrongdoing.

■ The request for punitive damages, however, is barred. Punitive damages are not available for intentional infliction of emotional distress. *Knierim v. Izzo*, 22 Ill.2d 73, 88, 174 N.E.2d 157, 165 (1961)

The Defendants raise a number of other defenses such as the Illinois Workers Compensation Act, the Illinois Human Rights Act, and the Immunity Act's statute of limitations. These defenses all relate to actions done within the scope employment. The Court has determined that these claims are already barred by the Immunity Act. The other defenses do not relate to a claim that the individual Defendants (other than Hasara) acted outside the scope of their employment.

## V. COUNT V

■ Frazier last alleges in Count V that Chief Harris and Pittman maliciously placed her in a false light before the public by leading the Springfield community to believe the false story that Frazier could have prevented a rape. In fact, the rape occurred before Frazier was ever dispatched to the scene. To state a claim for intentionally placing a person in a false light before the public, Frazier must allege that: (1) Chief Harris and Pittman placed her in a false light before the public, (2) that the false light in which she was placed would be highly offensive to a reasonable person, and (3) Chief Harris and Pittman acted with actual malice. *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill.App.3d 731, 739, 245 Ill.Dec. 465, 728 N.E.2d 547, 555 (2000).

Frazier alleges that Chief Harris, on three occasions, told Carl Madison, the head of the local chapter of the NAACP, that the Department was investigating Frazier to determine whether she could have prevented a rape. Chief Harris knew this representation was false. He knew that the Department was not trying to determine whether Frazier could have pre-

vented a rape. Chief Harris knew that the Department already knew that Frazier could not have prevented a rape because she was not dispatched until after the rape occurred. Chief Harris, therefore, placed Frazier in a false light knowing that it was false. Frazier claims he did this with malice. She, therefore, states a claim against Chief Harris.

Frazier does not state a claim against Pittman. Frazier alleges that Pittman stood by while Chief Harris made his false statements to Madison. She does not allege that Pittman took any affirmative steps to disseminate false information about her. She, therefore, does not allege that he did anything to place her in a false light. *Poulos,* 245 Ill.Dec. 465, 728 N.E.2d at 555.

■■■ Chief Harris argues that he is immune under the doctrine of absolute privilege and the Immunity Act. The Immunity Act only protects individuals from liability for negligent misrepresentations. 745 ILCS 10/2–210. Frazier can prevail if she can show Chief Harris intentionally placed her in a false light. The doctrine of absolute privilege protects Chief Harris from liability for any statements made within the scope of his duties as Police Chief. *Dolatowski v. Life Printing and Pub. Co., Inc.,* 197 Ill.App.3d 23, 28, 143 Ill.Dec. 757, 554 N.E.2d 692, 695 (1990). The privilege therefore depends on whether Chief Harris' conversations with Madison were within the scope of his duties. This is an issue of fact. The Court must assume the facts support Frazier's allegations for purposes of the Motion to Dismiss. The claim will not be dismissed based on the claim of absolute privilege.

■■■ Chief Harris also argues that Count V is barred by the statute of limitations. The statute of limitations for Frazier's false light claims is one year from the date that she knew, or should have known,

of the injury and that the injury was wrongfully caused. *Poulos,* 245 Ill.Dec. 465, 728 N.E.2d at 559. Chief Harris argues that the statute began to run on November 7, 2001, when Frazier went on medical leave. He argues that she knew that she suffered an injury on that date. She may have known of the injury, but it is not clear that she knew that the injury was wrongfully caused. Arguably, she did not know the injury was wrongfully caused until October 2002, when the news media broke the story that she could not have prevented the rape and that the Department kept this information from her and the public. If so, the action was filed well within the statute of limitations. At this point, the Court will allow Frazier to proceed on Count V against Chief Harris.

## VI. *ADDITIONAL MATTERS*

The Defendants raise additional matters in an effort to have the Complaint dismissed. They assert that the Complaint should be broken into more counts. The Federal Rules require breaking the claims into more counts if the separation facilitates the presentation of a matter. *Fed. R.Civ.P.* 10(b). The Court does not believe the separation is necessary in this case.

The Defendants argue that some of Frazier's claims are beyond the scope of her charge of discrimination filed with the EEOC. The Complaint does not contain a copy of the charges; only the right to sue letter is attached. A party is not required to attach documents such as the charge of discrimination; she needs only to plead generally that she has complied with EEOC procedures. *Fed.R.Civ.P.* 9(c); *Adwan v. Columbus–Cuneo–Cabrini Medical Center,* 635 F.Supp. 499, 500 (N.D.Ill. 1986). The Court will not go beyond the face of the Complaint in determining a motion to dismiss. *Fed.R.Civ.P.* 12(b)(6).

The Court therefore cannot say at this time that Frazier has asserted claims that exceed those in her charge of discrimination. The Defendants may raise this issue again later in this proceeding, at the summary judgment stage.

The Defendants also argue that some of Davis' claims are beyond the scope of his charge of discrimination. Davis says that he has filed two charges of discrimination. Neither charge is attached to the Complaint; however, Davis attached a right to sue letter to the Complaint which related to only one of the charges of discrimination. Davis has asked for leave to attach a second right to sue letter to the Complaint. Davis asserts that the second letter authorizes him to sue on the allegations which the Defendants argue are beyond the scope of the original charge. Leave is hereby granted to attach the second right to sue letter to the Complaint. At this point, the Court cannot say that Davis' claims exceed the scope of his two charges of discrimination since he has sufficiently alleged that he has complied with EEOC procedures and that the EEOC charges of discrimination are not attached to the Complaint. The Defendants may raise this issue again at a later point in this proceeding if they believe the allegations in the Complaint regarding Davis still exceed the scope of the charges of discrimination for which Davis has received right to sue letters.

The Defendants also ask the Court to strike certain paragraphs in the pleadings as impertinent and immaterial. The Court denies this request. The paragraphs provide background and are relevant to establish the existence of a custom or practice of discrimination within the Department. This is an element of municipal liability under Title VII. The paragraphs will not be stricken.

THEREFORE, Plaintiffs' Motion for Leave to Add Exhibit 10 (d/e 20) is ALLOWED. The Defendants' Motion to Dismiss (d/e 15) is ALLOWED in part and DENIED in part. The Court DENIES the Motion to Dismiss with respect to the following claims brought against the City and the individual Defendants in their individual capacities:

(1) Frazier's claim:

   (a) In Count I for disparate treatment and hostile work environment against the City;

   (b) In Count II for disparate treatment and hostile work environment against the City and all of the individual defendants except Mayor Hasara;

   (c) In Count III against the individual Defendants, other than Hasara, for conspiracy outside of the scope of their employment to deprive her of her rights;

   (d) In Count IV against the individual Defendants, other than Hasara, for intentional infliction of emotional distress committed by those individual Defendants outside the scope of their employment, but only for compensatory damages; and

   (e) In Count V against Defendant Chief Harris.

(2) Davis' claim for disparate treatment and retaliation against the City in Count I and his claim for disparate treatment and retaliation against the City and Chief Harris in Count II;

(3) Officer Harris' claim for disparate treatment, hostile work environment, and retaliation against the City in Counts I and II;

(4) Ewing's claim for disparate treatment against the City in Count I and his claim for disparate treatment against the City and Chief Harris in Count II;

(5) Joy's claim for disparate treatment, retaliation, and hostile work environment

against the City in Counts I and II, and a retaliation claim against Chief Harris in Count II;

(6) Holman's claim for hostile work environment against the City in Counts I and II; and

(7) Moore's claim for disparate treatment and hostile work environment against the City in Counts I and II.

The Court ALLOWS the Motion to Dismiss as to all other claims, including all claims against all individual Defendants in their official capacities. No Plaintiff states a claim against Defendant Hasara, and she is dismissed from this action. Stelivan and Williams do not state claims. Plaintiffs Stelivan and Williams are dismissed as parties in this case.

The remaining Defendants are directed to file an answer to the remaining claims by July 7, 2003.

IT IS THEREFORE SO ORDERED.