# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 07-1944

CARL MADISON,

*Plaintiff-Appellant,*

*v.*

RENATTA FRAZIER, KOURTNEY W. MITCHELL,
RENATTA'S HEART, INCORPORATED, an
Illinois corporation, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 C 3283—**Richard Mills**, *Judge.*

———————

ARGUED MAY 30, 2008—DECIDED AUGUST 22, 2008

———————

Before BAUER, RIPPLE and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.*   In late 2001, Renatta Frazier, an African-American police officer with the Springfield Police Department, became the subject of an internal affairs investigation when she was accused of failing to prevent a rape while on duty. The incident occurred on October 31, 2001, when Frazier allegedly failed to re-

spond to a dispatch call. She left the Department in November 2001 on a medical leave and apparently never returned due to the allegations that surrounded her conduct that day. That same year, she approached the Black Guardians, a group that advocates for the interests of American-American police officers, who directed her to Carl Madison, an African-American and president of the local National Association for the Advancement of Colored People ("NAACP") chapter in Springfield, Illinois (the "City"), for assistance in addressing the allegations. Madison recommended legal counsel to Frazier and discussed the investigation of Frazier's job performance with City representatives. After frequent discussions, Frazier and Madison disagreed as to the appropriate course of action regarding the dispute and parted ways. Frazier was eventually cleared of the allegations surrounding the dispatch call and subsequently joined a lawsuit against the City that claimed racial discrimination in its hiring practices. *See Frazier et al. v. Harris*, 266 F.Supp.2d 853 (C.D.Ill. 2003). The parties reached a financial settlement in 2004.

On March 13, 2002, an article was published in a City newspaper, the State Journal Register, stating that Madison and the NAACP "dropped Frazier's case" due to her lack of cooperation. On March 18, 2002, the Black Guardians sent Madison and the NAACP a letter, indicating that they no longer needed the NAACP's assistance in the discrimination cases (including Frazier's) pending against the City.

In 2003, Frazier began to write about her experiences with the Department. These writings evolved into a book

titled *The Enemy in Blue: The Renatta Frazier Story* (the "Book"), which was co-authored by Frazier's son, Kourtney Mitchell, and published in 2005 by Renatta's Heart, Inc., an Illinois corporation. The prologue describes the story as "one woman's fight against the enemy of racial and gender discrimination in the system of a police department." The beginning chapters of the Book describe Frazier's background, including her childhood, family, and life as a probationary officer with the Department.

Relevant to this appeal, Chapter Seven, titled "Almost Buried Alive," relates the events surrounding October 31, 2001, Frazier's perplexity at the accusations that swirled around her conduct on that day, and the aftermath, including her medical and financial difficulties. The end of the chapter, also known as the "fantasy sequence," begins with the words "[d]uring this time of turmoil in my life, one day in my imagination I fantasized the following scenario" and describes Frazier's imaginary interaction with various people. She imagined that she was lying in the streets of Springfield, bleeding:

> As I looked up, I thought I saw a lot of people standing in the distance. I wasn't sure; I had been beaten so badly, I felt dizzy and my vision was blurred. I began to yell as loudly as I could: "HELP! HELP!" I thought maybe they couldn't hear me. Perhaps the pain had limited my ability to yell. Even so, I began to drag my body with all the strength that remained. My faint yell for help seemed to go undetected. I decided to approach the man closest to me. He was standing with his back to me, and he appeared to have his arms

folded across his chest. "Mister," I said, "can you help me please, I've been hurt and they left me for dead." As the man turned around to reveal his face, I was astonished and confused to see that he was black. He didn't say anything. He just shook his head in a right-to-left motion. He turned his head and began to walk away. I approached other people one by one— prominent people, leaders in the community, political figures, pastors, preachers, business owners. All black, and all too selfish, too afraid, and too complacent to "practice what they preach." God forbid that they risk their comfortable homes to help me. So once again I was left for dead.

\* \* \* \*

[I]n my mind, this imaginary experience was equivalent to a physical attack, a brutal beating. As I shared this imaginary account with my husband he made a profound statement: "That this was a modern day lynching."

  Chapter Eight, entitled "Integrity Is: Who You Are When No One's Looking," describes how Frazier contacted Madison, the NAACP, and the Black Guardians, in late 2001, for insight on how to defend herself against the City's accusations:

In the weeks that followed, I began to feel that the president of the local NAACP branch was not working in my best interest. I spoke to him daily over the phone, and his conversation seemed more centered around my letting this matter go than fighting for the truth. "Let's forget it, and sweep it under the rug."

> I repeated, "Man, whose side are you on, mine or theirs?" "I'm trying to get you back to work and put this behind you," he said. I replied, "I know damn well they are all wrong and they are trying to destroy my life." He said, "Renatta, they're willing to make this go away, but I need your cooperation." I replied, "Oh, yeah? Tell them it's not going away and neither am I. As a matter of fact, tell them that when they start talking dollars, then we can talk."

Later in Chapter Eight, Frazier writes that she met with a NAACP lawyer to discuss a possible lawsuit against the City. After the meeting Frazier decided not to hire the lawyer:

> It was then that I made my decision to sever my ties with the local NAACP branch. I spoke with Carl Madison on the phone and said, to him, "I do not believe you are acting in my best interest." "I am notifying you at this time that I will no longer consult with you concerning my case." Later, I read and heard that Mr. Madison had decided to drop me. I couldn't believe what I was reading and hearing. The Guardians were outraged. We knew as well as he did that it didn't happen like that at all. The severing of the ties had been done long before he made this statement. Maybe he planned to run for some political office or was trying to obtain a politically connected employment opportunity. Whatever the reason, my respect for him diminished to nothing.

Following this alleged phone call to Madison, Frazier "had many other brushes or encounters with him, mostly

from a distance. However close or far away the encounters may have been, I couldn't bring myself to speak to him or even recognize his presence. 'Real men don't lie.' I thought, 'real men don't sell out.' "

In 2005, Madison, now a citizen of Ohio, filed this diversity action against Frazier, Mitchell and Renatta's Heart, Inc. (collectively the "Defendants"), complaining that the fantasy section and above-mentioned statements in Chapter Eight of the Book amounted to libel and portrayed him in a false light. Defendants filed a motion to dismiss the complaint (or alternatively, for summary judgment). After reviewing the facts on the record (such as the respective parties' affidavits and Frazier's deposition testimony), the district court granted summary judgment for the Defendants, finding that (1) the fantasy section was fictional and capable of innocent construction, (2) the descriptions of the events in Chapter Eight were judgmental opinions, and (3) the phrase "real men don't lie," in the context in which it was used, was *per se* defamatory, but not actionable because Madison failed to establish that the Defendants acted with actual malice. Madison filed this timely appeal.

### I.

Madison argues that (1) the district court erred in finding that the "imaginary black man" in the fantasy sequence was capable of innocent construction; (2) statements in Chapter Eight accuse Madison of "selling out" and lying for purely selfish reasons ("to run for some sort of political office or was trying to obtain a politically connected

employment opportunity"), and that these statements have injured his reputation within the African-American community; (3) the statement that Madison was a liar was not an opinion, but a factual statement concerning Madison; and (4) defamatory statements about Madison, who is a public figure, were made with actual malice, where Defendants failed to review any source material while writing the Book, and Frazier's purported recollection of the events was inaccurate.

We review *de novo* the district court's decision to grant summary judgment, construing all the facts and inferences in favor of Madison. *See Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005). If the moving party meets this burden, the non-moving party must submit evidence that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* We apply the substantive law of Illinois, the state in which this diversity case was filed. *See Global Relief*

*Found., Inc. v. New York Times Co.*, 390 F.3d 973, 981 (7th Cir. 2004).

Defamation is the publication of any statement that "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." *Seith v. Chicago Sun-Times, Inc.*, 371 Ill.App.3d 124, 308 Ill.Dec. 552, 861 N.E.2d 1117, 1126 (2007) (quoting *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214 (1996)). To prove a defamation claim, the evidence must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result. *Seith*, 308 Ill.Dec. 552, 861 N.E.2d at 1126. Some statements are considered defamatory *per se* because they are "so obviously and materially harmful" to a plaintiff that his injury may be presumed and he does not need to prove actual damages to recover, *Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1214, while other statements are considered defamatory *per quod*, which "requires the plaintiff to allege both extrinsic facts to establish that the statement is defamatory and special damages with particularity." *Myers v. Levy*, 348 Ill.App.3d 906, 283 Ill.Dec. 851, 808 N.E.2d 1139, 1147 (2004). Madison relies on the theory of defamation *per se*.

Illinois recognizes five categories of statements which are considered actionable *per se*; two are pertinent to this case: (1) those imputing an inability to perform or want of integrity in the discharge of one's duties of office or

employment; and (2) those that prejudice a party, or impute lack of ability, in his or her trade, profession or business. *Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1214-15. Although a statement may fit into one of these categories, this fact, standing alone, "has no bearing on whether the alleged defamatory statement is actionable," *Hopewell v. Vitullo*, 299 Ill.App.3d 513, 233 Ill.Dec. 456, 701 N.E.2d 99, 102 (1998), because certain factors may render defamatory statements nonactionable as a matter of law. For example, if a defendant's statements are capable of an innocent, nondefamatory construction, a plaintiff cannot maintain an action for defamation *per se*. *See Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1221. Further, the First Amendment affords protection from liability to a speaker expressing an opinion that does not misstate actual facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Moriarty v. Greene*, 315 Ill.App.3d 225, 247 Ill.Dec. 675, 732 N.E.2d 730, 739 (2000). Madison believes that various statements made in the Book impute a want of integrity on his part, that as the president of the local NAACP chapter, he is involved with many issues of racial equality within the City's businesses and public offices, and that the statements prejudiced his reputation as a hard working advocate for the African-American community.

### A. Fantasy Sequence

Madison argues that the district court erred in finding that the fantasy sequence was subject to innocent construction because (1) the sequence directly precedes the next

chapter which names Madison, and therefore "sets the stage" for the discussion of Madison's relationship with Frazier; and (2) Madison is the only African-American in the Book portrayed in an unfavorable light. Defendants argue that the sequence was clearly identified as "fantasy," Madison was never identified by name in the fantasy sequence, and Frazier presented the sequence as fiction from the outset.

"The so-called 'innocent construction rule' in Illinois requires a court to consider the statement in context and give the words of the statement, and any implications arising from them, their natural and obvious meaning." *Solaia Tech., LLC v. Speciality Publ'g Co.*, 221 Ill.2d 558, 304 Ill.Dec. 369, 852 N.E.2d 825, 839 (2006). A statement that may innocently or reasonably be construed as refer-ring to a person other than the plaintiff cannot be action-able *per se*. *Salamone v. Hollinger Int'l, Inc.*, 347 Ill.App.3d 837, 283 Ill.Dec. 245, 807 N.E.2d 1086, 1089 (2004). While this rule favors a defendant because a tougher standard is warranted where damages are presumed, it "does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable." *Tuite v. Corbitt*, 224 Ill.2d 490, 310 Ill.Dec. 303, 866 N.E.2d 114, 123 (2007). Our court, as well as Illinois courts, have said that "[w]hether a statement is reasonably capable of an innocent construction is a question of law for the court to decide." *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 640 (7th Cir. 2005); *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 180 L.E.2d 307, 607 N.E.2d 201, 207 (1992).

It is reasonable to read the statements made in the fantasy sequence and not call into question Madison's integrity or his reputation. In the fantasy, Frazier is beaten and left "to die," and she approached other people for help, who were "all black, and all too selfish, too afraid, and too complacent to 'practice what they preach.'" The "imaginary scenario" fails to identify Madison, or anyone else, by name, and therefore is very capable of innocent construction.

Furthermore, statements that cannot "reasonably [be] interpreted as stating actual facts" are protected under the First Amendment. These statements (or "opinions") cannot give rise to a cause of action for defamation in the interest of "provid[ing] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695; *see Lifton v. Bd. of Educ. of the City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (holding that Illinois law requires that an allegedly defamatory statement must contain an objectively verifiable factual assertion); *Pease v. Int'l Union of Operating Engineers Local 150, et al.*, 208 Ill.App.3d 863, 153 Ill.Dec. 656, 567 N.E.2d 614, 619 (1991) ("Words that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable."). The Illinois Supreme Court considers several nonexclusive factors in determining whether a statement constitutes an opinion or factual assertion: (1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's

literary or social context signals that it has factual content. *J. Maki Constr. Co. v. Chicago Reg'l Council of Carpenters*, 379 Ill.App.3d 189, 318 Ill.Dec. 50, 882 N.E.2d 1173, 1183 (2008) (citing *Tuite*, 310 Ill.Dec. 303, 866 N.E.2d at 121). Whether a statement is an opinion or fact is a question of law. *Moriarty*, 247 Ill.Dec. 675, 732 N.E.2d at 740.

The fantasy sequence purports to be a symbolic represen-tation of Frazier's frustration and contempt for the events that had consumed her life over the previous years. Illinois law is clear that allegedly defamatory words are to be interpreted as they appear to be used and according to the idea they were intended to convey to the reasonable reader. *Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1217. Clearly the statements convey to the reasonable reader that Frazier imagined she had been beaten and needed someone to come to her assistance; a reasonable reader would perceive that the "imaginary" event was a reference to her reality—that she believed she was being persecuted because of her race and had no one to turn to for help. No reasonable reader would construe Frazier's fantasy to have specific factual content. Frazier did not claim to have been actually beaten and left for dead. The literary context and setting in which the fantasy sequence was published leads easily to the conclusion that the sequence was a dream without factual support.

We are cognizant that prefatory language does not control whether statements labeled as "fiction" may be actionable, *Republic Tobacco*, 381 F.3d at 729; *Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1221; however even the most careless reader must perceive that this "fantasy" was no

more than rhetorical hyperbole. We find that the fantasy sequence cannot be actionable *per se*.

### B. Chapter Eight

Next, Madison argues that the district court erred in finding that the statements made in Chapter Eight were not actionable assertions of fact and were constitutionally-protected opinions. Madison points to the statements such as "who's side are you on, mine or theirs," and "[m]aybe he planned to run for some sort of political office or was trying to obtain a politically connected employment opportunity," and argues that these statements are factual assertions that he was acting on behalf of interests that did not include Frazier, and thus could not be opinions. We disagree, and find these statements to be vague and unprovable allegations which do not give rise to a defamation claim. *See Hopewell*, 233 Ill.Dec. 456, 701 N.E.2d at 105 ("[w]e note that in one sense all opinions imply facts; however the question of whether a statement is actionable is one of degree . . . [t]he vaguer and more generalized the opinion the more likely the opinion is non-actionable as a matter of law."). Clearly, Frazier was frustrated that she had parted ways with Madison, however, as the district court noted, she "wondered about his motives; she did not state that Madison was in fact motivated by political concerns." The very word "maybe" implicates subjective judgment. Frazier's speculations fail to amount to verifiable assertions of fact, lacking precise and readily understood meaning. *See Wilkow v. Forbes, Inc.*, 241 F.3d 552, 555 (7th Cir. 2001) (applying Illinois law

and finding that "[i]f it is plain that the speaker is express-ing a subjective view, an interpretation, a theory, conjec-ture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not action-able.") (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

### C. "Real Men Don't Lie"

We reach the last statements of the Book that Madison believes to be defamatory. He contends that the statement "[r]eal men don't lie . . . real men don't sell out" refers to Madison, and it imputes that (1) he was acting on behalf of the City instead of Frazier's; (2) he was incapable of performing his role at the NAACP with competence and integrity; and (3) the statements lowered him in the eyes of the African-American community. Frazier concedes that she was referring to Madison (and all men in general) when she made the statement.

In Illinois, to succeed under the relevant categories of defamation *per se* in this case, a plaintiff must have been accused of lacking *ability in his trade* or doing something bad *in the course of carrying out his job*. *Cody*, 409 F.3d at 857; *Clarage v. Kuzma*, 342 Ill.App.3d 573, 276 Ill.Dec. 995, 795 N.E.2d 348, 356 (2003). We have found that statements deemed to be defamatory *per se* in Illinois under these categories have been related to job performance, as op-posed to attacks related to personal integrity and character. *Cody*, 409 F.3d at 856-57; *Clarage*, 276 Ill.Dec. 995, 795 N.E.2d at 356 (finding accusations of lying to govern-

ment officials were defamatory *per se*, where the plaintiff was not accused of lying to family and friends, but rather to government officials with whom it was his *job* to communicate honestly); *Heying v. Simonaitis*, 126 Ill.App.3d 157, 81 Ill.Dec. 335, 466 N.E.2d 1137, 1143 (1984) (statements made by doctors regarding personality conflicts between the plaintiff nurse and her fellow employees did not impugn her ability as a nurse). However, sometimes personal integrity is so intertwined with job skills, that an attack upon it could constitute defamation *per se*. *See Kumaran v. Bortman*, 247 Ill.App.3d 216, 186 Ill.Dec. 952, 617 N.E.2d 191, 199 (1993) (holding that a newspaper article accusing a teacher of filing "scam" lawsuits was defamatory *per se* because part of a teacher's job is to set a good example and serve as a role model for her students). Calling Madison a liar and a sell-out to the African-American community, in the context of an ongoing public battle with the City and its discrimination policies, imputes a lack of integrity in his duties as NAACP president, specifically his involvement with issues of racial equality within the city's businesses and public offices.

So to determine whether the statement can be reasonably interpreted as stating actual facts protected under the First Amendment, we look at whether the statement has a precise and readily understood meaning; whether the statement is objectively verifiable as true or false; and whether the statement's literary, social, or public context signals that it has factual content. *Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1220.

In this context, referring to someone as one who "lies" has a clearly precise meaning—"to create a false or mis-

leading impression" or "to make an untrue statement with intent to deceive." Merriam–Webster Collegiate Dictionary (11th ed. 2008) (online at http://www.m-w.com). In addition, referring to someone as a "sell out" in this context refers to one who "betrays one's cause or associates especially for personal gain." *Id.* Frazier's statements were made within the context of accusing Madison of failing to tell the truth about who "dropped" whom first, and the overall literary context of the Book represents a professional and personal struggle about false allegations of misconduct as a police officer, as told through the eyes of the woman who experienced the accusations first hand. The Book's accusations and accounts were directed at the Department and its allegedly discriminatory hiring practices, Frazier's involvement in that controversy, and her belief that Madison and the NAACP failed to come to her assistance.

The question, however, is whether these statements are objectively verifiable as true or false. A *false* assertion of a fact can be defamatory even when couched within an apparent opinion or rhetorical hyperbole. *Solaia*, 304 Ill.Dec. 369, 852 N.E.2d at 840; *Dubinsky v. United Airlines Master Executive Council*, 303 Ill.App.3d 317, 236 Ill.Dec. 855, 708 N.E.2d 441, 451 (1999) (finding that calling someone a "crook" was not an actionable statement because it was not made in any specific factual context, and "[o]ne cannot rely on an assumption that those who heard the statement were completely apprised of all the developments in the . . . controversy so as to create a definitive factual context for the use of the word 'crook'"); *see also Milkovich*, 497 U.S. at 18-19, 110 S.Ct. 2695 (finding that

the phrase "[i]n my opinion, [plaintiff] is a liar" may still imply a false assertion of fact if the facts on which the speaker bases his opinion are either incorrect or incomplete, or if his assessment of them is erroneous).

We find that the phrase "sell out" is incapable of being verified as a statement of fact; it is merely an opinion that Madison betrayed his race. "Free speech is not restricted to compliments. . . . [M]embers of a free society must be able to express candid opinions and make personal judgments. And those opinions and judgments may be harsh or critical—even abusive—yet still not subject the speaker or writer to civil liability." *Van Duyn v. Smith*, 173 Ill.App.3d 523, 123 Ill.Dec. 367, 527 N.E.2d 1005, 1014 (1988) (citing *Sloan v. Hatton*, 66 Ill.App.3d 41, 22 Ill.Dec. 783, 383 N.E.2d 259, 260 (1978)).

At first blush, the statement at issue, "real men don't lie" seems to be nothing more than a difference of opinion. Frazier believes Madison lied when he said he cut off ties with her first; Madison believes he did not lie in making this statement. However, we must determine whether the context behind the phrase "real men don't lie" makes the statement defamatory *per se*. In *Piersall v. SportsVision of Chicago*, the plaintiff, a well-known sports announcer, accused the defendant of calling him a liar. The court held that the general statement that someone is a "liar" without being put in a context of specific facts, is merely opinion. 230 Ill.App.3d 503, 172 Ill.Dec. 40, 595 N.E.2d 103, 107 (1992). The court reasoned that in order to determine whether a statement is fact or opinion, a court must evaluate the totality of the circumstances and should

consider whether the statement is capable of objective verification as true or false. *Id.* Here, the context of the statement was clear—Frazier stated that she called Madison weeks before the article was published to tell him that she was no longer interested in his help in the Department's investigation against her. Insinuating that Madison lied referred to Madison's actions or omissions in response to the events that had taken place, in particular, the conversation with Frazier that ended the relationship. Frazier was making the case that she was in possession of objectively verifiable facts—that she called Madison first—and therefore his assertions were false.

We are willing to accept the fact that Frazier referred to Madison as a liar, and even to accept that under this specific context, the statement was defamatory *per se*. But even assuming the same, Madison cannot prevail. Madison concedes that he is a public figure, therefore he cannot maintain a suit for defamation unless he can prove that the Defendants' acted with "actual malice." A public figure plaintiff may hold a speaker liable for the damage to reputation caused by publication of defamatory statements only if he establishes actual malice, that is, he must show that (1) the utterance was false, and (2) it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Piersall*, 172 Ill.Dec. 40, 595 N.E.2d at 105. Reckless disregard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Costello v. Capital Cities Commu-*

*nications, Inc.*, 125 Ill.2d 402, 126 Ill.Dec. 919, 532 N.E.2d 790, 798 (1988). This inquiry is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant published defamatory statements despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth. *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323; *Chicago Dist. Counsel of Carpenters Pension Fund et al. v. Reinke Insulation Co.*, 464 F.3d 651, 655 (7th Cir. 2006); *Piersall*, 172 Ill.Dec. 40, 595 N.E.2d at 105. Where a factual dispute concerns actual malice, the appropriate question on summary judgment is whether the evidence in the record could support a reasonable jury finding that a plaintiff has shown actual malice by clear and convincing evidence. *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1317 (7th Cir. 1988) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Madison believes that the conversation did not occur, and he was the one that severed ties with Frazier first, due to her lack of cooperation with the NAACP and their lawyers. In support of his argument, Madison points to circumstantial evidence. He posits that other statements made in the Book were factually inaccurate. For instance, Frazier gave the wrong hometown of her lawyer, and she admitted in her deposition that she "may get conversations mixed up because I talked to [Madison] a lot." This evidence does not persuade us, for we fail to see how it establishes that Frazier lied or acted with reckless disregard for its truth or falsity, about the particular conversation in question. Frazier testified that she may have been unclear as to the order in which her conversa-

tions with Madison took place, but as far as the content of the conversation she had when she "dropped" him, she did not indicate that she was confused or "mixed up" about that specific conversation.

According to Madison, Frazier "very obvious[ly] dislike[d]" Madison and her "personal animosity" towards him supports an inference that she disregarded the accuracy of her memory. The Book does not attempt to mask Frazier's dislike for Madison; however, without something more concrete, ill will towards a public plaintiff cannot provide a sufficient basis for a finding of actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666-67, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Chicago Dist. Council of Carpenters Pension Fund*, 464 F.3d at 656; *Martin v. State Journal Register*, 244 Ill.App.3d 955, 184 Ill.Dec. 197, 612 N.E.2d 1357, 1363 (1993).

Madison argues that Frazier admits that she wrote the Book "mostly" from memory, failing to review any source material. But a failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *Harte-Hanks*, 491 U.S. at 667, 109 S.Ct. 2678. Instead, there must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (quoting *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323).

Madison submits that while Frazier has not admitted that she doubts her memory of whether or not Frazier initiated the separation from Madison, these are facts that have not yet been established because the district court

granted summary judgment before Madison had an adequate opportunity to determine the truth of the statements. It is true that a defendant in a defamation action cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *Catalano v. Pechous*, 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350, 360 (1981) (citing *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323). However, we must first independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." *Chicago Dist. Council of Carpenters Pension Fund*, 464 F.3d at 655; *Bose Corp. v. Consumers Union of United States Inc.*, 466 U.S. 485, 510-11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

After reviewing the entire record, including depositions of the Defendants and affidavits offered by both parties and assuming "real men don't lie" in this particular context is defamatory *per se*, we conclude that Madison has failed to show any genuine issue of material fact as to whether Frazier doubted her belief that she—not Madison—initiated the "separation" between the two, which prompted her to imply that Madison was a liar. "Charged as we believe we are with considering the 'quantum' of proof required and . . . whether the evidence is of sufficient 'caliber or quality' to meet that 'quantum,'" we find that a reasonable jury would not find that Madison established actual malice with convincing clarity. *See Saenz*, 841 F.2d at 1319 (internal citations omitted).

Madison also argues that the statements in the Book support a cause of action for false-light invasion of privacy. However, because Madison's unsuccessful defamation *per se* claim is the basis of his false-light claim, his false-light invasion of privacy claim fails as well. *See Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007).

## II.

For the reasons stated above, we AFFIRM the district court's grant of the Defendants' motion for summary judgment.

WOOD, *Circuit Judge*, dissenting. Summary judgment is a procedure that requires strict mental discipline on the part of both trial and appellate judges. We are not supposed to evaluate the parties' evidence to see whose is the more persuasive. Instead, we must ask only whether a hypothetical trier of fact—a jury, or a court in a bench trial—could find in favor of the non-moving party. This necessarily means that both trial judges and appellate judges must sometimes reject summary judgment in favor of a party who (they think) will probably win in

the final analysis. The line between a case that ought to be thrown out on summary judgment because there are *no* disputed issues of material fact, and one in which material facts are disputed but that seems like a long shot, can be blurry.

Here, my colleagues have decided that plaintiff Carl Madison's case falls on the former side of that line. See *ante*, at 18-21. With respect, I cannot agree with that assessment. For the reasons that I outline briefly here, I believe that Madison has introduced evidence of actual malice that, if believed by the trier of fact, would support a verdict in his favor. I would therefore reverse the summary judgment in favor of the defendants and remand the case for a trial on Madison's defamation claim.

I focus on actual malice because I agree with much of the rest of the majority's analysis. Most of the statements that Madison challenges in defendant Renatta Frazier's book, *The Enemy in Blue,* could not support a recovery for him. As the majority explains, the "fantasy sequence" is just that—an account of an imaginary beating and its aftermath. No one is identified either by name or description, and thus it is saved by Illinois's "innocent construction" rule. Similarly, the statements in Chapter Eight of Frazier's book wondering whose side Madison was really on, or whether he might run for public office, are merely statements of opinion. But, as the majority concedes, the statements accusing Madison of lying (and perhaps, I would add, even those that blast him for "selling out") impugn his integrity, his character, and his fitness to serve as the head of the local NAACP. The

majority "accept[s] the fact that Frazier referred to Madison as a liar," and it accepts "that under this specific context, the statement was defamatory *per se.*" *Ante*, at 18. I, too, reach that point in the analysis. Where our paths diverge is on the final step that Madison must take: because he is a public figure, he must show that the defendants acted with actual malice. I believe that he can do so.

First, Madison points to the four-year gap between the events recounted in the book and the publication of the book. Frazier and Mitchell (her son and co-author) both stated in their depositions that they did no fact-checking when writing the book and used no outside source material. They relied only on Frazier's memory and did nothing to ensure the accuracy of her recollections, nor did they follow up on her assumptions to find out if what she suspected had come to pass. Somewhat inconsistently, Frazier also stated that she made phone calls to certain people to verify certain pieces of information, but she admitted that she never did anything of the sort with respect to what she published about Madison. A jury could consider it reckless disregard of the truth to allow four years to elapse without ever checking to see whether this kind of inflammatory statement about another person is indeed true. See *Catalano v. Pechous*, 419 N.E.2d 350, 360-61 (Ill. 1980) (finding liability where the defendant was himself "the original source of the defamatory statement" and where the defendant "made no inquiry to ascertain whether it was his inference rather than another which was the correct one to draw").

The fact that Frazier had the presence of mind to check facts relating to *certain* people, but not Madison, only increases the reasonableness of an inference that she recklessly disregarded the truth in what she wrote about Madison.

Second, Frazier stated in her deposition that she did not recall the details of her conversations with Madison (such as who said what or when), yet she said at other points in the deposition that she used direct quotes when recounting those conversations in the book and that her intent was to convey the conversations just as they had happened. In other words, her testimony was contradictory, both professing doubt about the accuracy and completeness of her memory *and* claiming that her memory was good enough to summon up direct quotes from her talks with Madison. The most frequent phrases that Frazier uttered during her deposition were that she "can't remember" or "can't recall" something. This is odd for a woman who claims to have written an entire book based solely on her recollection. Her inconsistency about what she remembered could lead a jury to infer that she was lying about her ability to remember the conversations completely and accurately, or that she recklessly disregarded whether her recollections were true.

Third, the book contains several inaccuracies. For example, Madison calls our attention to incorrect information in the book about a lawyer whom the NAACP hired to assist Frazier. More significantly, a book reviewer (who, as it happens, was treated favorably in Frazier's book) pointed out in a published review a litany of mis-

statements in the book, which ranged from careless errors to vindictive mischaracterizations. The reviewer wrote, "I know for a fact that Frazier got some of her facts wrong—most by accident but a few because of her belief that she was the victim of a grand conspiracy." She added that the book "could have benefited [*sic*—and irony noted] from a spell check, a grammar check, and, especially, a reality check. People she likes get special treatment (in her book, I'm young and skinny; in real life, I'm aged and gelatinous), and people she dislikes get body-slammed (Carl Madison left town just in time)." This, too, supports an inference that Frazier knew that she was distorting the truth in a way that was malicious toward her "enemies."

Fourth, and as the majority points out, Frazier had a "very obvious dislike" for Madison, *ante*, at 20, and her personal animosity toward him is painfully apparent, both in the book and in the rest of the record. While not dispositive, the extent of Frazier's negative feelings toward Madison buttresses the other available evidence and lends further support to an inference that Frazier recklessly disregarded the truth about him when writing her memoir.

When everything is taken together (as a trier of fact would be required to view it), Madison has produced enough evidence to support a reasonable inference that the defendants acted with actual malice when writing and publishing *The Enemy in Blue*. This is a classic jury issue, and the record before us contains sufficient evidence to allow a jury to decide it. I respectfully dissent

from my colleagues' decision to end Madison's case at this juncture.